**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

**RICHARD ALEXANDER WILLIAMS,**

     **Plaintiff,**

**v.**             **Case No.  1:13-cv-00222-MW-GRJ**

**FIRST ADVANTAGE LNS SCREENING**
**SOLUTIONS, INC. f/k/a LEXISNEXIS**
**SCREENING SOLUTIONS, INC.,**

     **Defendant.**

_____/

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT**
**AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
**AND/OR REMITTITUR**

**INTRODUCTION**

After the close of evidence at trial, the jury returned a verdict in favor of Plaintiff and against First Advantage on Plaintiff's claims under Section 1681e(b) of the Fair Credit Reporting Act ("FCRA").  The jury's verdict should be reversed as a matter of law.  Importantly, the FCRA is not a strict liability statute and does not subject a consumer reporting agency ("CRA") like First Advantage to liability for negligence whenever it prepares a consumer report that contains inaccurately matched information.  Rather, Section 1681e(b) only requires First Advantage to follow reasonable procedures to assure maximum possible accuracy in preparing background reports.  The trial evidence does not, as a matter of law, support a finding that First Advantage failed to meet that statutory requirement in this instance.  Here, First Advantage's procedures met or exceeded industry standards and its consumer accuracy match rate—99.62%—definitively attests to the reasonableness of those procedures.

Even if a finding of negligence was supported by the trial record, that record is wholly deficient of evidence sufficient to justify a finding that First Advantage acted in willful disregard of its statutory obligations.  The stipulated and undisputed facts presented at trial definitively prove that First Advantage's matching procedures meet the industry standard for matching a consumer to a public record and result in a 99.62% matching accuracy rate.  The undisputed facts presented at trial also show that First Advantage has implemented multiple additional steps to assure maximum possible accuracy of its reports through extensive training of its personnel, regular auditing of results, and other quality control measures. While a combination of human error and the limited number of readily available personal identifiers in public records may lead to a small percentage of mismatches, no evidence supports equating those mismatches to a reckless disregard of FCRA obligations by managerial employees of First Advantage.

Assuming *arguendo* that the jury's finding of negligence could be sustained, the jury's award of $250,000 in compensatory damages is excessive and must be substantially reduced. The evidence presented at trial shows that Plaintiff failed to mitigate his actual economic harm by quitting a job in his field of study in November 2012 that provided higher pay and greater benefits than the Rent-A-Center position he was denied in March 2012.  Further, Plaintiff's generalized testimony and conclusory statements that he was highly upset and lost some sleep and appetite are insufficient to sustain any emotional distress award, let alone one of at least $171,728.  Finally, Plaintiff failed to establish that he suffered any actual loss of reputation.

Even if the jury's finding of willfulness could be sustained, the jury's award of $3.3 million in punitive damages award is wholly unsupported by the record or is excessive and must be substantially reduced.  No evidence can be found in the trial record that satisfies the standards for awarding punitive damages established by the United States Supreme Court in *State Farm—*

*i.e.*, that First Advantage's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. Moreover, the amount of punitive damages awarded is manifestly unjust and falls far outside of Constitutional limits.

<u>SUMMARY OF EVIDENCE AND TESTIMONY AT TRIAL</u>

**I.      First Advantage's Procedures For Preparing Criminal Background Reports**

No central database of criminal conviction records is maintained by the federal government through which CRAs like First Advantage can definitively match a consumer to a criminal record by using the consumer's unique Social Security number. (Tr. 464:24-465:5.) [1] Instead, First Advantage (and its predecessor companies) created a national database for criminal records, referred to as the National Criminal File ("NCrF") by acquiring and compiling bulk criminal records from county and state courthouses and offices of court administration throughout the U.S. (Tr. 464:21-465: 3.)

The bulk files from various counties and states contain data and information regarding criminal charges and outcomes and limited information (such as name and date of birth) about the individuals connected to those charges. The form in which this information is recorded and the specific information provided by each county (including the available personal identifiers) varies widely. (Tr. 465-466.) Accordingly, the difficulty associated with locating personal identifying information in public records poses the single largest obstacle to preparing complete and accurate background reports. (Tr. 475-15:23.)  In particular, Social Security numbers—the most unique and personal identifier—are generally redacted by the courts that generate such records due to the growing risk of identity theft. (Tr. 466:4-8.)

---

[1]      Citations to the trial record are made in the following manner: (Tr. Page:Lines).

Credit reporting agencies (or credit bureaus) such as Experian and TransUnion are operationally distinct and perform different functions from background reporting agencies such as First Advantage. Notably, credit bureaus have far more personal identifying information accessible to them than a background reporting agency performing a criminal background check. (*See* Tr. 492-493.) While criminal records reviewed and matched by criminal background reporting agencies like First Advantage typically only contain the name and date of birth of an individual, credit bureau records generally include an individual's name, date of birth, and, typically, Social Security number. (Tr. 492:1-493:6.)

First Advantage prepares background reports based on the specific search requests it receives from its customers. (Alt Dep. 32:13-34:5, **ECF No. 70-2**.)[2] If a customer orders an NCrF search, the consumer's information is initially passed through to a query of the NCrF database. (Alt Dep. 30:1-19) Once the search of the NCrF is complete, the system returns to the Records Adjudication Team ("RA Team") a list of potential "hits," if any, of public records that may belong to the consumer. (Alt Dep. 30:16-24.) First Advantage's RA Team then reviews the potential hits to determine whether they can be matched to the consumer. (Alt Dep. 40:8-18.) In doing so, the RA Team follows First Advantage's standard operating procedure of requiring that at least two identifiers on the public record match those consumer identifiers provided by the customer, such as first and last name (which counts as one identifier) and the date of birth of the consumer. (Alt Dep. 35:17-24, 37:3-14.) In some instances, the computer system returns records that do not match a consumer's first name exactly. (Alt Dep. 36:1-14.) This is done to capture instances in which nicknames or variations of first names are used in public records. (Alt Dep. 36:1-14) This prevents potential underreporting of criminal records. (Tr. 517:8-11.)

---

[2]     Videotaped depositions of several individuals were played at trial and incorporated into the trial record. The trial record, however, simply refers back to the deposition transcripts.

When a consumer has a common name or if the adjudicator does not have complete information, the adjudicator applies additional procedures before matching a record to a consumer.  (Alt Dep. 31:18-32:2, 37:20-38:7.)  For example, as was done in this case, adjudicators will attempt to develop additional information to confirm that the record belongs to the consumer and is complete.  (Alt Dep. 31:18-32:2,37:22-38:7.)  This may involve ordering a supplemental search from First Advantage's Court Research and Retrieval Group (the "CRRG").

 The CRRG is responsible for obtaining public records directly from the source (usually online court databases, if accessible, or by going on-site to a county courthouse and retrieving hard copy documents in person).  (Tr. 260:3-10.)  In the case of Plaintiff's reports, for example, the CRRG processed internal orders for supplemental information on public records found in the NCrF after the RA Team matched two personal identifiers to Plaintiff and reviewed criminal records online that matched Plaintiff's identifiers. (261:17-25; 272:7-9.)[3]

### A.    Additional Steps Taken By First Advantage To Assure Maximum Possible Accuracy.

First Advantage takes multiple steps to ensure that its matching procedures are consistently followed by team members to assure the maximum possible accuracy of its reports. *First*, newly-hired adjudicators go through rigorous training. Specifically, adjudicators go through an initial four-week training program prior to performing any work. During training, adjudicators review the systems and processes associated with records adjudication to ensure they understand how to research and generate an accurate background report. (474:7-25.) When new adjudicators come out of that training and join the RA Team, they are gradually transitioned into adjudicating records. (*Id.*) During this initial phase of adjudicating records on the RA Team,

---

[3]    Rather than go straight to the CRRG, the RA Team may also use online resources directly available to the adjudicator.  (Alt Dep. 32:3-32:12.)

new adjudicators' work is double-checked or reviewed by a member of the supervisory team before being finalized and submitted to a customer. (*Id.*)

*Second*, in 2012, First Advantage rolled out its Records Handling Initiative to further cement the importance of maintaining and consistently utilizing its standard operating procedures in creating reports. Vice-President of Operations Matthew O'Connor testified that the Records Handling Initiative was a "collective effort across First Advantage's operational teams to ensure consistency and alignment across all teams." This initiative was designed and implemented to ensure that the background reporting teams perform "tasks in a similar and consistent fashion." (472:1-473:7; *see also* Exhibit 22.)

*Third*, First Advantage has quality control auditors that perform quality and accuracy checks on reports to ensure that First Advantage team members are following procedures and producing accurate reports. The auditing and quality control team pulls samples of work completed by the RA Team and the CRRG team, rechecks and reworks the samples pulled, and monitors those records for completeness and accuracy. (Tr. 470:9-471:6.) First Advantage takes the accuracy of its reports seriously, and O'Connor testified that First Advantage has terminated employees for failing to meet its quality standards. (Tr. 471:7-12.)

 First Advantage's standard operating procedures, in fact, successfully minimize matching errors.  As stipulated, First Advantage prepared 3,554,163 background reports between 2010 and 2013 containing public record information on a nationwide basis.  During that time, First Advantage made 13,392 corrections to reports based on consumer disputes where the consumer complained that a public record contained in his/her background report belonged to another individual.  Based on those figures, First Advantage's error rate for "not me" or "not mine" errors from 2010 to 2013 was 0.38%. Thus, during the relevant time period, First

Advantage's accuracy rate when matching public records to a consumer was 99.62 percent. (*See* Stipulated Facts ¶ 7; Tr. 94:19-95:3.)

    **B.    Expert Consensus Regarding First Advantage's Industry-Accepted Standard Operating Procedures**

First Advantage's expert, Oscar Marquis, opined that on the basis of his 40 years of experience implementing and studying operating procedures in the consumer reporting industry, no screening companies require more than a match of two unique identifiers when matching a consumer to a criminal record. (495:16-19.) Marquis further explained that it is wholly acceptable to utilize close-matching nicknames when attempting to match criminal records to a consumer. (Tr. 517:3-11.) As indicated above and as Marquis noted, failing to do so may result in underreporting criminal records for individuals who go by a nickname. (*Id.*)

  Moreover, Marquis testified that public records related to criminal convictions typically provide only the name and date of birth of the individual, with no Social Security number recorded due to identity theft concerns. (492:23-25; 495:11-15.) This testimony was corroborated by O'Connor, who testified that the single largest obstacle to accurate matching is the difficulty associated with locating personal identifying information. (475:15-23.)

Plaintiff's expert, Evan Hendricks, generally agreed with First Advantage's position on the industry-accepted use of personal identifiers to match criminal records to an individual such as Plaintiff, stating:

- "[T]here's no absolute" with respect to what personal identifiers are appropriate in any given situation (Tr. 365:17-18);

- He is not aware of any standard requiring more than two unique identifiers when matching records to a consumer (Tr. 383:9-10);

- There is no "hard and fast rule" in the industry on how to use personal identifying information (Tr. 367:3-4);

- It is reasonable to match a first name based on a nickname (Tr. 367:17-368:1);

- It is not an industry standard for CRAs such as First Advantage to use so-called cross-blocking tools, which attempt to prevent information from appearing on the wrong consumer's record if that information was matched to another person in the past (Tr. 371:2-6).

**C.    First Advantages' Adherence To Standard Operating Procedures In This Case.**

At trial, it was established that First Advantage had standard operating procedures in place during the relevant time period. Moreover, it was not substantively disputed that First Advantage followed its standard operating procedures in preparing the two background reports on Plaintiff for Rent-A-Center and Winn-Dixie. Specifically, First Advantage:

- Searched the NCrF database utilizing personal identifying information for Plaintiff provided by Rent-A-Center and Winn-Dixie to determine if records in the database matched the personal identifying information supplied;

- Identified "hits" in the NCrF database for Plaintiff based on a match of two unique personal identifiers (first name (an accepted variation of "Richard"); last name; and date of birth);

- Confirmed that the criminal records belonged to a person matching Plaintiff's name and date of birth, who resided in Florida;

- Ran supplemental reports and searches to verify the accuracy of the information contained in the NCrF database and to see if additional identifying information was available;

- Matched public records to Plaintiff under the standard operating procedures, resulting, in this instance, in an inaccurate match of Plaintiff Williams with Ricky Williams.

(*See* Stipulated Facts ¶¶ 9-27; Tr. 261, 264, 272-273, 297, Exs. 10, 32.)

**II.    Plaintiff's Claimed Damages**

At trial, the jury awarded Plaintiff $250,000.00 in compensatory damages and $3.3 million in punitive damages. (Tr. 616-617.)

Plaintiff sought—and, it appears, the jury awarded[4]— $78,272.00 in the form of lost wages. Plaintiff, however, secured a position with the Levy County Sheriff's Department as a 911 Dispatcher in November 2012, approximately nine months after Rent-A-Center revoked its conditional offer of employment.  (Tr. 169:10-13.) The 911 Dispatcher job was a full-time position with salary and benefits in Plaintiff's field of study (criminal justice), and he voluntarily entered the academy to train for this position. (170:20-22,171:3-5.) Plaintiff testified at his deposition that his supervisor, Donna Capps, wanted him to continue working in the position, but he voluntarily resigned because the dispatch room had "no windows in it" and because it "just wasn't the job for me." (173:1-14.)  At trial, however, in direct contradiction to his prior sworn testimony, Plaintiff testified that Ms. Capps terminated him. (136:5-8.)

The jury also awarded Plaintiff a minimum of $171,728.00 in emotional distress and loss of reputation damages. To support his claim for emotional distress damages, Plaintiff testified that he was "highly upset" that he did not receive the Rent-A-Center position because "they had televisions in there and . . . you see all the football games and it was just a very energetic type of environment that was driven for me to make sales." (134:20-25.)

When he learned of the error in the Winn-Dixie background report, Plaintiff stated he was "horrified" and "upset that it came back like this again." (141:19-20,154:8-9.) Plaintiff further said reviewing the second report generated as a result of his application to Winn-Dixie made him feel "horrible." (148:16.)  Plaintiff also said he had "trouble sleeping" and had headaches (154:6-13.)

Plaintiff's mother testified that Plaintiff was "bothered" when he did not receive the Rent-A-Center position, and when he was not immediately hired at Winn-Dixie, it was "rough."

---

[4]        The Verdict Form did not distinguish between lost wage damages and emotional distress damages. This number assumes here that the jury awarded Plaintiff all lost wage damages.

(Tr. 243:19-22.) She further stated that she did not believe Plaintiff was eating like he should and that his sleeping was affected (Tr. 243:23-244:1-16).

Plaintiff claimed in support of his "loss of reputation" damages that he grew concerned he would be labeled a criminal (149:12-16), but he did not explain how his reputation was damaged beyond this general concern. Plaintiff also testified that the two individuals who had initially hired him at Rent-A-Center and Winn-Dixie told him that First Advantage's reporting system was accurate and that they would need to move on to other applicants. (*Id.*) In contrast to Plaintiff's "concern" that he would suffer a diminished reputation in his community, however, he admitted that he was hired as a dispatcher by the Levy County Sheriff's Department in part because of his and his family's good reputation in the community. (170:16-19.) Further, Plaintiff ultimately did receive a position at Winn-Dixie in November 2013. (Stipulated Facts, ¶ 13.)

With respect to punitive damages awarded at trial, the punitive-to-compensatory damages ratio is 13.2:1.

## **LEGAL STANDARD**

### A.    **Rule 50(b)**

Fed. R. Civ. P. 50 allows the Court "to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 447-48 (2000) (quotation omitted); Fed. R. Civ. P. 50(a). The question before the Court is therefore whether the evidence is "legally sufficient . . . to find for the party on that issue." *McGinnis v. American Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016).

### B.    **Rule 59(a)-(e)**

As an alternative to entering a judgment as a matter of law, the Court may grant a new trial after a jury trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ.P. 59(a)(1)(A). "[M]otions for a new trial are committed to the discretion of the trial court." *Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999). And where an award "exceeds the amount established by the evidence" the remedy is "a remittitur order reducing a jury's award to the outer limit of the proof" under Rule 59(e). *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447 (11th Cir. 1985). In making such determinations, the Court must "weigh the evidence favoring the jury verdict against the evidence in favor of the moving party." *Minks v. Polaris Indus. Inc.*, 2007 WL 1452906, at *2 (M.D. Fla. 2007).

## ARGUMENT

### I.     The Trial Evidence Does Not Support The Jury's Verdict That First Advantage Negligently And Willfully Violated The FCRA.

Plaintiff claimed at trial that First Advantage violated the FCRA by both negligently and willfully failing to follow reasonable procedures to assure maximum possible accuracy when preparing a consumer report. *See* 15 U.S.C. §1681e(b). Plaintiff, however, did nothing more than substantiate a fact already stipulated to at trial: that First Advantage reported inaccurate information regarding Plaintiff. As a matter of law, this is an insufficient basis to create liability and the jury's verdict must not stand; the FCRA is not a strict liability statute and errors alone do not entitle Plaintiff to relief. *Moore v. First Advantage Enter. Screening Corp.*, 2013 WL 1662959, at *6 (N.D. Ohio Apr. 17, 2013); *Johnson v. Equifax, Inc.*, 510 F. Supp. 2d 638, 647 (S.D. Ala. 2007). Because Plaintiff failed to establish anything beyond the mere errors themselves (in addition to the other reasons provided below), the Court should grant First Advantage's motion under Rule 50(b) or, alternatively, under Rule 59.

### A.   Plaintiff Did Not Meet His Burden Of Proving First Advantage Willfully Violated The FCRA.

While First Advantage acknowledged at trial that errors were made in preparing the two background reports at issue, Plaintiff did not present any evidence at trial to establish a willful violation of the FCRA. Under *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), willful violations of the FCRA are assessed for "reckless disregard."  551 U.S. at 60, 69.  An action is considered reckless only if, under an objective standard, it carries "an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Id.* at 68 (quotation omitted). The United States Supreme Court explained in *Safeco* that "a company subject to [the] FCRA does not act in reckless disregard of [the statute] unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.* at 69.

From an objective point of view, no evidence supports a finding that First Advantage willfully disregarded its statutory obligations in this case.  Indeed, the uncontroverted record evidence establishes that when running both background reports on Plaintiff:

- First Advantage had industry-accepted standard operating procedures in place;

- The procedures First Advantage used for preparing criminal background reports, including only reporting records that match first name, last name, and date of birth, met or exceeded industry standards for matching and reporting criminal records;

- First Advantage regularly engages in additional quality control measures, including training, Records Handling Initiatives, supplemental verification searches, and quality control audits, to ensure its procedures are consistently followed and that maximum possible accuracy is achieved;

- First Advantage followed its standard operating procedures here by matching Plaintiff's name and date of birth with criminal records, performing supplemental searches, and physically going to the site of the records to retrieve and review the records themselves after those records were disputed by Plaintiff; and

- First Advantage's procedures *did and do in fact* assure maximum possible accuracy because during the relevant time period First Advantage accurately matched criminal records with consumers 99.62% of the time.

Under similar circumstances, where uncontroverted evidence establishes that a CRA's procedures are in line with the industry standard and where specific procedures are in place to ensure FCRA compliance and background report accuracy, district courts have refused to attach a finding of "willfulness" to a CRA's reporting errors. *See, e.g.*, *Singletery v. Equifax Info. Servs.*, LLC, 2011 WL 9133115, at *13 (N.D. Ala. Sept. 22, 2011) (Equifax's "accuracy rate of 90%" or greater in responding to consumer free file disclosure requests to conclude that Equifax's procedures represented a "good-faith effort . . . to assure the greatest accuracy possible"); *Lagrassa v. Jack Gaughen, LLC*, 2011 WL 1257384, at *5 (M.D. Pa. Mar. 11, 2011) (finding no willfulness and noting that "a violation of the FCRA by itself does not amount to willful noncompliance with the FCRA"; "the evidence submitted by [the CRA] supports a finding that there were procedures in place to ensure FCRA compliance, and that this incident was likely a mistake."). Ultimately, perfection is not guaranteed in this industry and the law does not require it. *Anderson v. Trans Union LLC*, 367 F. Supp. 2d 1225, 1237 (W.D. Wis. 2005) (the "goal of [Section 1681e(b)] is to have consumer reports that are fair and accurate[,] [the statute] does not demand perfection from an industry that deals in billions of pieces of information."); *See also Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604 (6th Cir. 2016) (efforts to maintain accuracy of reports highly relevant to whether willfulness exists); *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409 (4th Cir. 2001) (same).

Here, Plaintiff presented no evidence that First Advantage's procedures were not generally followed, nor did Plaintiff genuinely contend that the Company's procedures are ineffective. Nor could he; First Advantage provided ample, credible evidence regarding its good faith efforts to prepare accurate background reports and the multiple steps it takes—auditing,

training, consistency initiatives, and supplemental research—to combat inaccurate matching. Indeed, Plaintiff's expert conceded he knew of no CRA standard requiring anything more than two identifiers when matching criminal records to an individual. It bears repeating that First Advantage accurately matched public records to consumers 99.62% of the time during the applicable time period. (*See* Stipulated Fact ¶ 7.)  That accuracy percentage dispels any notion that First Advantage, as a Company, acts in reckless disregard of its statutory obligations.

Instead, Plaintiff spent the entire trial identifying actions he believed First Advantage should have taken under the unique circumstances present to avoid the inaccurate matching of him to Ricky Williams. Plaintiff specifically claimed, for instance, that First Advantage should have run an Accurint or Experian report to capture additional personal identifying information before finalizing the background reports pertaining to him. But, the testimony is uncontroverted that there is no such accepted procedure for CRAs. (Tr. 495.) As noted above, even Plaintiff's own expert admitted that CRA's preparing criminal background reports do not require more than two identifiers before matching a public record to a consumer. (Tr. 383:9-10.) Plaintiff tried to argue that First Advantage should implement "cross-blocking" software to ensure an initially mismatched criminal record does not turn up in subsequent criminal background reports run for that same consumer. But, again, Plaintiff's own expert stated he is not aware of a single CRA preparing criminal background reports that has implemented such procedures.  (Tr. 371:2-4.)[5]

Plaintiff further contended at trial that because the height contained in the subject criminal records was not Plaintiff's actual height, First Advantage should have noticed and not

---

[5]     Plaintiff also contended at trial that First Advantage should have known it was matching incorrect records to Plaintiff because the address on the criminal records was not Plaintiff's residence. It is not unreasonable, however, to think that someone residing within Florida and matching Plaintiff's name and date of birth would change residences or that criminal records from years past may reveal an old address. A CRA does not sit in a position to comprehend every single life event occurring in a consumer's life when it is preparing a background report. This, again, evidences the high standard Plaintiff wishes to impose on First Advantage; a standard the FCRA and the agencies administering that law have chosen not to impose on CRAs because of its corresponding negative impact on the flow of consumer information.

matched the Winn-Dixie records with Plaintiff (First Advantage received driver's license information from Plaintiff in conjunction with his dispute of the Rent-A-Center report). Such an argument fails for two key reasons. First, the evidence at trial fully established that requiring two identifiers before running a report is the industry standard. Second, and fundamentally, while the FCRA requires that First Advantage adopt "reasonable" procedures to assure maximum possible accuracy, to quote the Seventh Circuit, "[t]he procedure urged by [Plaintiff] is not 'reasonable'" because it would "put an enormous burden on [CRAs]." *Childress v. Experian Info. Sols., Inc.,* 790 F.3d 745, 747 (7th Cir. 2015); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994) (CRA need not monitor all activities pertaining to a consumer's bankruptcies in order to ensure an accurate report).  Indeed, requiring that First Advantage comb through a consumer's height, weight, eye color, or hair color, or other identifiers beyond the industry-accepted standard neglects the commonsense realities of the consumer reporting industry.  It is undisputed that First Advantage—and other CRAs—runs millions of reports for employers legitimately seeking criminal background information on applicants across the country every year.  Requiring such detail when reviewing records would create an unnecessary and unjustified obstacle to the timely flow of consumer information and unduly burden First Advantage's operations, which had a 99.62% matching accuracy rate during the time period in which Plaintiff's reports were generated  (Tr. 517:8-11.)

What is required of CRAs is that the procedures they adopt be "reasonable in relation to the goal of accurate credit reporting." *Childress*, 790 F.3d at 747. What a plaintiff must show to succeed on a willful violation claim is that the CRA took action or deviated from those standards so severely that it knew or should have known it created an unjustifiably high risk of harm. Nothing in the record suggests conduct rising to such a level here.  It is true here that human

error contributed to the mismatching of public records to Plaintiff, and that closer attention by an Adjudications Team member to information available on the Florida Department of Corrections website may have avoided the mismatch of Plaintiff to the Broward County criminal conviction of Ricky Williams in the Winn-Dixie report. But it is firmly established in the trial record that First Advantage had implemented time-tested procedures that meet the industry standard *that it followed in this case* to ensure the accuracy of its reports. When Plaintiff disputed the accuracy of the reports, the reports were promptly reinvestigated and corrected. Further, no evidence in the record suggests that management level employees of First Advantage acted recklessly. Thus, the Court should grant First Advantage's motion and enter judgment accordingly.

> **B**. **Plaintiff Did Not Meet His Burden Of Proving First Advantage Negligently Violated The FCRA.**

The jury's negligence finding was also against the clear weight of the evidence, and the Court should enter judgment as a matter of law in First Advantage's favor. First Advantage is not liable under the FCRA's negligence provision if it followed "reasonable procedures to assure maximum possible accuracy, but nonetheless reported inaccurate information" in the criminal background report. *See Johnson*, 510 F. Supp. 2d at 646–47 ("It is also important to note that the FCRA does not require error free consumer reports."); *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971-72 (7th Cir. 2004). Plaintiff did argue, as already discussed, that First Advantage should do more and should have implemented additional procedures here. But, as previously noted, a CRA is not liable under the FCRA for failing to follow reasonable procedures simply because there were other "possible" procedures that, in hindsight, may have prevented the inaccurate information in the report. Rather, § 1681e(b) holds a CRA "only to a duty of reasonable care," which "is determined by reference to what a reasonably prudent person would

do under the circumstances." *Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir. 1996); *Johnson* 510 F. Supp. 2d at 647.

Plaintiff presented no evidence—beyond the stipulated facts that the background reports contained mismatched information about another person with his name and date of birth—to prove that the procedures First Advantage used for matching and reporting criminal record information were unreasonable. The FCRA contemplates that mistakes will occur, especially given the "complexity" and "volume of information involved," and "a mistake does not render the procedures unreasonable." *Sarver*, 390 F.3d at 972.

Here, the record evidence establishes that the procedures First Advantage used in matching and reporting the criminal history records in Plaintiff's reports meet or exceed industry standards —*i.e.*, what other reasonably prudent persons do under these circumstances. Plaintiff presented no contrary evidence regarding industry standards. Such uncontroverted evidence establishes that First Advantage's procedures were reasonable. *See Nelski v. Trans Union, LLC*, 86 F. App'x 840, 844 (6th Cir. 2004) (evidence that the procedures meet industry standard is relevant in determining whether procedures are reasonable).

At bottom, two separate background reports with errors more than one year apart do not alone make First Advantage liable for negligence in performing its duties under the FCRA. A finding of negligence under the FCRA requires more proof than mere suggestions about what additional steps a CRA could have taken to head-off inaccurate matches in rare cases that occur infrequently out of the millions of reports prepared annually containing public record information (99.62% of which are accurately matched). No such evidence was presented here. Accordingly, the Court should grant First Advantage's motion under Rule 50(b) or, alternatively grant a new trial under Rule 59.

II.    **Even Assuming Liability Under The FCRA, The Trial Evidence Does Not Support The Jury's Award Of Damages**

    A.    **Plaintiff Is Not Entitled To Emotional Distress Damages**

The emotional distress damages awarded to Plaintiff by the jury cannot stand based on the self-serving, vague, and conclusory testimony presented at trial.  In its verdict, the jury awarded Williams $250,000.00 in compensatory damages. While the verdict form does not distinguish between emotional distress/loss of reputation damages and lost wage damages, Williams requested $78,272.00 in lost wages. Thus, the jury awarded Williams a minimum of $171,728.00 for emotional distress/loss of reputation. That award is excessive and wholly unsupported.

Importantly, the FCRA does *not* presume damages and a plaintiff must affirmatively establish his entitlement to them. *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 610 (7th Cir. 2005) ("high threshold for proof of damages for emotional distress" under the FCRA) (quotation omitted). And "[a] claim for emotional distress damages must be supported by something more than the plaintiff's own conclusory allegations." *Riley v. Equifax Credit Info. Servs.*, 194 F. Supp. 2d 1239, 1244-45 (S.D. Ala. 2002).

In *Cousin v. Trans Union Corp.*, 246 F.3d 359, 370-71 (5th Cir. 2001), for instance, the Fifth Circuit held that the plaintiff had failed to provide sufficient evidence to support entitlement to emotional distress damages when he testified he was "very upset," felt "like nobody was listening" and like he was "trapped inside [a maze that he] can't get out of." Rather, the Fifth Circuit held that a FCRA plaintiff must provide "a degree of specificity" in the testimony to support the award. *See id.*

While Plaintiff's mother also testified, she provided nothing more than boiler plate responses to the questions posed and simply repeated the same answers Plaintiff provided. This is not enough. In *Wilson v. Taylor,* 733 F.2d 1539 (11th Cir. 1984) (overruled on other grounds) the Eleventh Circuit reduced an award of $100,000 for emotional distress down to $5,000 where the plaintiff testified that "he felt frustration, anger, humiliation, and embarrassment because of the way he was fired" and presented other witnesses that testified he was "very down and out," "very, very upset, very distressed, emotionally upset, emotionally disturbed, very volatile, [and] angry," but where he did "not discuss nor relate any extreme emotional damage." *See also Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 604-05 (7th Cir. 2006) (a plaintiff's testimony that "she 'stress[es],' gets tension headaches, and clashes with her fiancé over her credit problems, are, at most, self-serving and conclusory statements about her emotional distress," and where "she did not seek any medical or psychological treatment for the emotional distress she claims resulted from Experian's actions," is insufficient as a matter of law to establish emotional distress damages).

Here, Plaintiff's award in emotional distress damages—in excess of $170,000—cannot stand in light of the vague and conclusory testimony he propounded to support them. Plaintiff, for instance, merely testified that he was "highly upset" about losing his position at Rent-A-Center and that he had "trouble sleeping" and experienced some headaches. As noted above, Plaintiff's mother testified to nothing more, merely stating that things were "rough" and she didn't think Plaintiff was eating or sleeping like he should.

Further, for whatever may be attributable to Plaintiff's claimed "loss of reputation" damages, Plaintiff's testimony did not corroborate his allegations. Indeed, while Plaintiff said he feared he would suffer a diminished reputation in his community, it is undisputed that he

received a job offer from the Levy County Sheriff's Department due in part to a positive

reputation and he was, in fact, timely hired once the Winn-Dixie report issues were resolved.

(149: 12-16, 170:16-19, Stipulated Facts, ¶ 13.)  In short, he provided nothing to substantiate his

assertion that his reputation was diminished by the two reports.

Given the dearth of concrete or specific evidence regarding Plaintiff's emotional distress,

First Advantage requests that the Court to grant its motion as to emotional distress, remitting the

judgment and eliminating the award of emotional distress damages or reducing them to a far

lower amount, in accordance with the evidence presented at trial.

### B.      Plaintiff's Claimed Wage Loss Damages Are Not Supported By The Record

Plaintiff further failed to mitigate his lost wages damages, and any wage loss attributable

to First Advantage's purported violation of the FCRA should be cut off after Plaintiff accepted

employment at the Levy County Sheriff's Department.  Plaintiff's lost wage damages should be

reduced to approximately $14,000.00 ($450 per week for the approximately 32 weeks between

the time Plaintiff's offer at Rent-A-Center was revoked in March 2012 and when he secured his

position with the Levy County Sheriff's Department in November 2012).

The 911 Dispatcher job Plaintiff secured with the Levy County Sheriff's Department was

a full-time position with salary and benefits in Plaintiff's field of study. (170:20-22,171:3-5.)

Plaintiff testified under oath at his deposition that his supervisor, Donna Capps, wanted Plaintiff

to continue working at the sheriff's department, but that he voluntarily quit because the dispatch

room had "no windows in it" and it "just wasn't the job for him." (173:1-14.)  At trial, however,

Williams changed his story and contended for the first time in this action that he was terminated.

But, such testimony runs contrary to the clear weight of the evidence, and the jury plainly

erred in relying on it.  To allow Plaintiff's testimony to stand as support for the compensatory

damages award would amount to a fraud by Plaintiff on the Court. The Court should find that Plaintiff's "own testimony . . . contradict[s] the inference []he would ask the jury to draw" and enter judgment in accordance with the fact that he voluntarily quit in the face of a duty to mitigate his alleged wage loss, thereby cutting off such damages when he failed to retain his employment. *Stegall v. Audette*, 212 F. App'x 402, 405 (6th Cir. 2006); s*ee Reiner v. Family Ford, Inc.*, 146 F. Supp. 2d 1279 (M.D. Fla. 2001); *Senello v. Reserve Life Ins. Co.*, 667 F. Supp. 1498 (S.D. Fla. 1987).

Alternatively, the Court should grant First Advantage's motion for a new trial because Plaintiff provided false testimony. It is beyond dispute that "if a verdict is based on false testimony" a court "has the discretion under Rule 59 to grant the injured party a new trial." *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993). To determine whether a new trial due to false testimony is supported, courts look to whether, without the material witness's false testimony, "a jury might have reached a different conclusion" and whether "the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it . . . ." *Harris v. CVS Caremark Corp.*, 2014 WL 1764822 (N.D. Ala. 2014) (quoting *Williams v. United Dairy Farmers*, 188 F.R.D. 266 (S.D. Ohio 1999)). The jury relied on Plaintiff's testimony regarding his lost employment in determining that his wage loss continued until he secured employment at Winn-Dixie. Indeed, Plaintiff was the only witness to support his claimed lost wage entitlement. First Advantage had no idea that Plaintiff would contradict his prior deposition testimony and claim at trial that he was involuntarily terminated. As the record shows, First Advantage was taken back by Plaintiff's change of story and had no opportunity to call other witnesses or bring in other evidence to challenge such testimony, given what it rightly expected to be his testimony at trial.

Accordingly, the Court should either reduce Plaintiff's wage loss damages, or grant First Advantage a new trial on these bases.

### C.       There Is No Basis For Awarding Punitive Damages

First Advantage cannot be assessed punitive damages without a sustained finding of a willful violation of its duties under§ 1681e(b). *See* 15 U.S.C. § 1681n.  As shown above, the jury's finding cannot be sustained here.  Even if a finding of willfulness was justified, the $3.3 million award of punitive damages, constituting a ratio between punitive and compensatory damages of 13.2:1 is manifestly unjust, arbitrary, falls far outside of constitutional limits, and must be, at the very least, greatly reduced.

Indeed, Plaintiff did little to demonstrate that First Advantage's conduct was reprehensible or truly worthy of punitive damages under the law. Rather, he simply relied on a financial statement reporting that First Advantage's holding company purchased various entities that included LexisNexis Screening Solutions, Inc. (the predecessor to First Advantage Background Services Corp.) for approximately $336 million. That, Plaintiff argued, meant that an award of $3.3 million in punitive damages was appropriate. (Tr. 90-93, 564.) The record is devoid, however, of any truly probative evidence supporting this excessive award. In such instances of arbitrariness, punitive damages must be reduced. The Supreme Court has admonished that "presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). That is precisely what occurred in this instance. Further, while it is not *per se* inappropriate to argue that a corporate defendant's profitability

22

justifies a larger punitive damages award, Plaintiff *did not present any evidence of actual net worth or profitability* of the background screening entity. He instead relied on audited financial statements showing the purchase price of a group of related entities purchased by First Advantage in 2013. No such evidence, as far as First Advantage can determine, has justified such an award in the past.

The Due Process Clause "prohibits the imposition of grossly excessive or arbitrary punishments." *State Farm* , 538 U.S. at 416.  To determine whether, as here, a punitive damages award exceeds constitutional bounds, the Supreme Court in *State Farm* articulated three guideposts:

    (1)    the degree of reprehensibility of the defendant's misconduct;

    (2)    the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and

    (3)    the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id*. at 418 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996)).

Courts have held that the third guidepost is inapplicable to FCRA cases given its statutory construction. *Saunders v. Branch Banking And Trust Co. of VA*, 526 F.3d 142, 152 (4th Cir. 2008) ("Congress specifically chose not to limit punitive damages in suits brought by private parties . . . Thus . . . [w]e therefore here consider only the first and second guideposts."); *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255, 1265 (N.D. Ala. 2011) (same).

Application of the two pertinent guideposts plainly shows that the jury's $3.3 million punitive damages award is excessive and must be eliminated or greatly reduced.

**1.    First Advantage's Conduct Was Not Reprehensible**

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. In determining reprehensibility, the following factors should be considered:

(1)     whether the harm caused was physical as opposed to economic;

(2)     whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;

(3)     whether the target of the conduct had financial vulnerability;

(4)     whether the conduct involved repeated actions or was an isolated incident; and

(5)     whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419.

An evaluation of the *State Farm* reprehensibility factors conclusively establishes that First Advantage's conduct was not reprehensible:

(1)     As to the first factor, to the extent there was any harm caused to Plaintiff, such harm was as a matter of law purely economic rather than physical. *See State Farm*, 538 U.S. at 426; *Bach v. First Union Nat'l Bank,* 149 F. App'x 354, 361 (6th Cir. 2005) (citing *State Farm* and recognizing that harm caused by a FCRA violation is the result of "a transaction in the economic realm, not from some physical assault or trauma, and there were no physical injuries").

(2)     Because First Advantage's actions occurred in the "economic realm," it cannot be said that the allegedly tortious conduct displayed an indifference or reckless disregard for the health and safety of others. *See id.*

(3)     Nor was Plaintiff financially vulnerable; it is undisputed that he was able to secure alternative employment with the Levy County Sheriff's Department and he subsequently received the job at Winn-Dixie after the error on his second report was promptly corrected.

(4)     While there were two separate errors in this case, they were both promptly remedied after they were brought to First Advantage's attention. This, plainly, was an anomalous case and one for which First Advantage has designed and implemented standard operating procedures in place to prevent. Inaccurate criminal background reports are exceedingly rare and there is no trial evidence that similar mismatching errors to those experienced by Plaintiff have occurred in the past. Thus, the fourth factor militates in First Advantage's favor.

(5)     Even if this Court concludes that First Advantage's conduct was negligent or reckless, there is no evidence that First Advantage acted out of intentional malice, trickery, or deceit.  Indeed, all record evidence establishes that First Advantage followed standard operating procedures in this case, performed supplemental searches on Plaintiff's records, retrieved the hard copy records before matching them with Plaintiff and, then, promptly corrected its actions when the errors were discovered. Accordingly, the fifth factor is not met.

Because not one of the five factors for reprehensibility is present, First Advantage's conduct was not reprehensible under *State Farm.  See id.* (no reprehensibility where only one factor present).  Accordingly, the reprehensibility guidepost establishes that $3.3 million punitive damages award is excessive.

### 2.     The Disparity Between The Harm Suffered By Plaintiff And The Size Of The Punitive Damages Award Demonstrates That The Punitive Damages Award Is Excessive

When comparing the disparity between harm suffered and the punitive damages award, the "proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *Gore*, 517 U.S. at 581. Here, there is no such reasonable relation and the award must be reduced.

In making an evaluation as to the reasonable relationship between harm and the award's size, the Eleventh Circuit has noted that the "comparison between the compensatory award and the punitive award is significant." *Sepulveda v. Burnside*, 432 F. App'x 860, 865 (11th Cir. 2011) (citations omitted). In particular, the ratio of punitive to compensatory damages is instructive. *See id.; State Farm*, 538 U.S. at 425. And where, as here, the compensatory damages award is substantial ($250,000), the Supreme Court has counseled that a 1:1 ratio between punitive and compensatory damages "can reach the outermost limits of the due process guarantee." *State Farm*, 538 U.S. at 425.

Indeed, while only one or two reported cases illustrating punitive to compensatory damages ratios under the FCRA exist in this Circuit, one of the larger FCRA punitive damage awards in this circuit involved far worse conduct than at issue here, but resulted in less than half the punitive to compensatory ratio. In *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255 (N.D. Ala. 2011), the Northern District of Alabama refused to remit a punitive damages award of $623,180 with a compensatory damage award of $100,000 (a 6.23:1 ratio). In that case, the defendant did not have procedures in place for correcting inaccurate reports, stood by results every time errors were brought to its attention, only checked its own records when there were disputes, and stood by the faulty system for years. Moreover, the plaintiff in that case attempted to correct the disputed information "numerous times over numerous years" but the defendant remained steadfast and refused to investigate or remedy the disputed information. *Id.* at 1263.

Here, the jury awarded Plaintiff $250,000 in compensatory damages when he, by all accounts, was to receive $450 per week at Rent-A-Center had he received the position; he was ultimately employed by Winn-Dixie despite the error on his background report; and First Advantage promptly corrected the errors well within the statutory period when it was notified of

them. Moreover, while the Supreme Court states that a 1:1 ratio is generally on the outermost limits of due process guarantees, the ratio present in this case—where two mistakes were made despite numerous efforts to ensure accuracy, both of which were swiftly resolved after Plaintiff notified First Advantage—is 13.2:1. Such an excessive award, in light of the good-faith conduct by First Advantage, simply cannot stand.

## **CONCLUSION**

First Advantage respectfully asks that the Court grant its motion under Rule 50(b) in its entirety. Alternatively, First Advantage asks that the Court grant its motion for a new trial under Rule 59 and/or remit damages to the level supported by the evidence.

Respectfully submitted,

FIRST ADVANTAGE BACKGROUND SERVICES CORP.

By  s/Joseph Turner
Joseph Turner
Illinois Bar No. 6195834
jturner@seyfarth.com
Jason M. Torres
Illinois Bar No.  6278611
jtorres@seyfarth.com
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Lead Counsel for First Advantage Background Services Corp.

Date:  November 28, 2016

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

**RICHARD ALEXANDER WILLIAMS,**

                **Plaintiff,**

**v.**                                         **Case No.  1:13-cv-00222-MW-GRJ**

**FIRST ADVANTAGE LNS SCREENING**
**SOLUTIONS, INC. f/k/a LEXISNEXIS**
**SCREENING SOLUTIONS, INC.,**

                **Defendant.**

_____/

## DEFENDANT'S LOCAL RULE 7.1(F) CERTIFICATE

Pursuant to Local Rule 7.1(F), I hereby certify that the Memorandum of Law submitted to this Honorable Court in support of First Advantage's MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL AND/OR REMITTITUR, contains 7,988 words when including all sections of the Memorandum, including headings, footnotes, and quotations, and excluding the caption, signature block, and certificate of service.

Respectfully submitted,

FIRST ADVANTAGE BACKGROUND SERVICES CORP.

By  s/Joseph Turner
Joseph Turner
Illinois Bar No. 6195834
jturner@seyfarth.com
Jason M. Torres
Illinois Bar No.  6278611
jtorres@seyfarth.com
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Lead Counsel for First Advantage Background Services Corp.

Date:  November 28, 2016

28914419v.2