# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**RICHARD ALEXANDER WILLIAMS,**

        *Plaintiff,*

**v.**                          **Case No. 1:13cv222-MW/GRJ**

**FIRST ADVANTAGE LNS
SCREENING SOLUTIONS, INC.,
F/K/A LEXISNEXIS SCREENING
SOLUTIONS, INC.,**

        **Defendant.**
_____/

## ORDER DENYING MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

You're a college-educated, law-abiding citizen with no criminal record. Given the abysmal post-recession job market, you cast a broad job-search net. Many employers deny you, few interview you, and even fewer seriously consider you for a position. Finally, you hear the words that you have been waiting for: "Welcome aboard (pending a criminal-background check)!" But you have nothing to fear—you've never been arrested, let alone convicted of a crime. Nonetheless, you eventually receive a letter notifying you that, apparently, you were arrested and convicted for selling cocaine. Knowing that to be untrue, you

successfully dispute the report. But it's too late—the employer already hired somebody else for the job.

Dejected, you continue your search and, after an even more strenuous search, you finally hear those magic words again. Yet this time, you receive a letter notifying you that you committed burglary and aggravated battery on a pregnant woman. You're disgusted to have been accused of such a heinous crime, and you, yet again, successfully dispute the report. *Déjà vu*; it's too late, the employer has moved on, and it takes five months for you to convince them that you are not a criminal so that they are finally willing to bring you on board. What are you to do—give up and accept your fate, or file a Fair Credit Reporting Act lawsuit?

The Plaintiff in this case, Richard Williams,[1] chose the latter option. He claims that Defendant First Advantage Background Services Corp. ("First Advantage")—a consumer reporting agency ("CRA") that runs background reports on potential employees for various employers—erroneously reported criminal records for a different person (career criminal "Ricky"

---

[1] This Court will refer to Mr. Williams as "Plaintiff" to avoid any (additional) confusion with "Ricky" Williams.

Williams) on two different occasions. He filed suit against First Advantage,[2] alleging that it violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*

After this Court granted summary judgment in favor of First Advantage on two of Plaintiff's FCRA claims, ECF No. 123, the remaining claims were tried by a jury. After Plaintiff's case-in-chief, First Advantage moved under Rule 50(a) for judgment as a matter of law and argued, in relevant part, that no reasonable jury could conclude (1) that it willfully or negligently violated the FCRA; (2) that Plaintiff was entitled to reputational damages; and (3) that Plaintiff properly mitigated his damages. Tr. at 399–426. This Court denied First Advantage's motion as to the negligence argument, the damages arguments, and took the willfulness argument under advisement. Tr. at 444–45. After First Advantage presented its case, the jury found in Plaintiff's favor and awarded him $250,000 in compensatory damages and $3,300,000 in punitive damages. First Advantage now renews its motion for judgment as a matter of law and, in the alternative,

---

[2] Originally, Plaintiff also sued the two employers that withdrew their employment offers—Rent-A-Center East, Inc. ("Rent-A-Center") and Winn-Dixie Stores, Inc. ("Winn-Dixie"). Those parties were later voluntarily dismissed. *See* ECF No. 44 (dismissing Winn-Dixie); ECF No. 42 (dismissing Rent-A-Center).

seeks a new trial. ECF No. 207 (motion); ECF No. 208 (memorandum). For the reasons set forth below, that motion is **DENIED.**

I

*A. First Advantage's Business, Policies, and Procedures*

First Advantage is a CRA that provides a variety of background-screening products and services. One of its primary services is running criminal-background checks on prospective employees for employers. The employers identify the background search's scope, their specific hiring criteria, and provide identifying information (typically first name, last name, and date of birth) for the prospective employee (or, in FCRA terms, the "consumer"). First Advantage then runs that search and applies the employer's hiring criteria to suggest whether the consumer is "eligible" or "ineligible" for employment.

Most of First Advantage's criminal-background searches are run through its National Criminal File, a self-maintained database of criminal records. Tr. at 464. If an employer orders a National Criminal File search, First Advantage runs the consumer's identifying information through an automated search of that database and First Advantage's Records Adjudication

4

Team "adjudicates" that application by reviewing any "hits" to determine whether they can be matched with the consumer. Pursuant to First Advantage's policies and procedures, it will only include a criminal record in a consumer's background report if that record contains two "identifiers"—for example, first-and-last[3] name (which counts as one identifier), social security number, driver's license number, date of birth, address, etc.—that match those for the consumer, which are provided by the employer.

Difficulties arise, however, if the consumer has a common name. In that scenario, First Advantage will only include a criminal record in the criminal-background report if that record either contains three matching "identifiers" (as opposed to two) or if a supervisor approves the record and notes that additional attempts were made to identify a third matching identifier. Tr. at 314–15. That process may include, for example, running a credit-bureau report (for example, Experian or Equifax) to crosscheck addresses, middle initials, or social security numbers. Tr. at 314.

---

[3] The first name, however, doesn't have to be a perfect match. Rather, First Advantage applies a self-defined "Fuzzy Logic" by allowing certain nicknames to return as first-name matches. Tr. at 29. For example, "Robert Smith" will match with "Bob Smith," "Nicholas Young" will match with "Nick Young," and so on.

Moreover, if a common-named consumer matches a criminal record for an individual with a different address, First Advantage is "supposed to go to use Experian and develop some address history information." Tr. at 318. First Advantage, however, approves only a limited number of its staff to run those reports. Tr. at 317–18.

Assuming that a criminal record is matched with a consumer, that consumer has the ability to dispute its accuracy. First Advantage will then review any information provided by the consumer and will order copies of the underlying record to determine whether the criminal record was erroneously matched with the consumer. If the match was erroneous, First Advantage will remove the record from the report and will apply a "case block" so that the same disputed record is not erroneously matched at a later date. Unlike many credit bureaus, however, First Advantage has not implemented "cross-blocking" or "flagging" procedures that block any and all erroneous records from one individual (the criminal) being matched with another (the consumer) again. Tr. at 358–60.

First Advantage—which charges approximately $11 to $12 for each background report—prepared 3,554,163 background

reports between 2010 and 2013 containing public-record information on a nationwide basis. Tr. at 93–94. Of those approximately 3.5 million reports, 17,431 were disputed, 14,346 resulted in a revised background report,[4] and 13,392 of those revised reports were based on disputes where the consumer complained that a public record in his or her report belonged to another individual.[5] Tr. at 93–94. That amounts to a .38% inaccuracy rate[6] nationwide.[7] Tr. at 95.

### B. Plaintiff's Missed Opportunities

After graduating with his bachelor's degree in criminology, Plaintiff applied in February 2012 for an Account Representative position at a Rent-A-Center store in Chiefland, Florida, where he had lived his entire life. Tr. at 26, 34. As part of that application

---

[4] 2,038 of those disputes were made by consumers located in Florida, and 1,746 of those disputes resulted in a revised background report. Tr. at 94.

[5] First Advantage refers to this species of error as a "not me" or "not mine" error.

[6] As explained later, the problem with such a figure is that it grossly understates the error rate given the limited universe of common-named consumers. Common sense dictates that it is much higher. *See infra* pp. 19–20.

[7] The inaccuracy rate in Florida, however, was .61% in 2010, .5% in 2011, .64% in 2012, and .28% in 2013. Tr. at 95.

7

process, Plaintiff agreed to undergo a drug test (which he passed) and a criminal-background check. Tr. at 116.

Rent-A-Center contracted with "Lexis Nexis"[8]—which has since been acquired by First Advantage—to perform these types of background checks and "adjudicate" applicants. As a part of its background check, First Advantage searched the National Criminal File and conducted a public-record search in Levy County. Tr. at 260, 263. Although the Levy County public-record search came back clean, the National Criminal File search "matched" Plaintiff with a 2009 sale-of-cocaine record[9] from Palm Beach County, Florida for "Ricky" Williams based on his name and date of birth. Tr. at 260. First Advantage verified that those records existed and that the information was "complete" by researching Palm Beach County court records online. Tr. at 261. Despite the fact that Palm Beach County is approximately 300 miles from Chiefland, tr. at 378, Plaintiff was deemed ineligible

---

[8] First Advantage acquired Lexis Nexis on February 28, 2013. Tr. at 92. In doing so, it absorbed all Lexis Nexis's liabilities. *Id.* For clarity purposes, this Court will refer to both entities as First Advantage.

[9] First Advantage actually matched Plaintiff with records relating to six crimes in Palm Beach County which listed "Ricky" Williams as the defendant, but only reported the cocaine record because the others were more than seven years old. Tr. at 261.

for employment by Rent-A-Center pursuant to Rent-A-Center's hiring criteria, tr. at 125. Critically, although First Advantage acknowledged that "Richard Williams" is a common name, it did not obtain three identifiers for that record or obtain supervisor approval to include it in the report. In fact, First Advantage mistakenly placed Plaintiff's social security number in the background report even though that was not used in matching him to that record. Tr. at 287.

First Advantage then sent the report (and adjudication of ineligibility) to Rent-A-Center, tr. at 96, and notified Plaintiff that it was reporting the cocaine record to Rent-A-Center, tr. at 117–18. Appalled, Plaintiff disputed the cocaine record and, in support, provided his social security number and a copy of his driver's license. Tr. at 126. First Advantage then reopened the investigation and, pursuant to its policies and procedures, obtained hard copies of the underlying court records. Plaintiff's dispute was resolved in his favor based on the difference between the 6'2" height listed on "Ricky" Williams's court records and the 5'10" height listed on Plaintiff's driver's license. Tr. at 264–65. Evidence presented at trial also established that the reinvestigation revealed that "Ricky" Williams's listed address

was in Boynton Beach, Florida—not Chiefland, Florida. Tr. at 265–66. First Advantage thus removed the criminal record from Plaintiff's report. Unfortunately, that resolution was too late for Plaintiff—Rent-A-Center had already moved on and hired somebody else for the position. Tr. at 127.

Undeterred, Plaintiff continued applying for a multitude of jobs. Plaintiff was eventually hired as a 911 dispatcher at the Levy County Sheriff's Office. Tr. at 135. While in the academy, however, Donna Capps—the communications supervisor— informed Plaintiff that he "wasn't meeting requirements." Tr. at 136. Plaintiff thus decided to leave the academy. *Id.* Plaintiff later obtained a part-time job at a Kangaroo gas station in Williston, Florida—which is quite some distance from Chiefland—but left that job too because all his pay was being spent on fuel to travel to and from work. Tr. at 137–38. Neither the Levy County Sheriff's Office nor Kangaroo retained First Advantage to run their criminal-background checks.

In early 2013, Plaintiff applied for and received a conditional offer of employment to work at a Gainesville, Florida Winn-Dixie store as a liquor store associate. Tr. at 35. As with the Rent-A-Center report, First-Advantage was tasked with

10

conducting the criminal-background check. And, in Plaintiff's words, it "happened again." Tr. at 141. First Advantage ran a National Criminal File search, yet this time it matched Plaintiff with burglary and aggravated battery on a pregnant woman records from Broward County, Florida, for "Ricky" Williams based on his name and date of birth. Tr. at 4. First Advantage verified that those records existed and that the information was "complete" by reviewing the Florida Department of Corrections website. Tr. at 289. That website noted that "Ricky" Williams was 6'2" tall. Tr. at 290. It also noted that "Ricky" Williams was incarcerated in the Broward County Jail. Tr. at 548. Again, the match was only based on two identifiers. Nonetheless, Plaintiff was deemed ineligible for employment by Winn-Dixie pursuant to Winn-Dixie's hiring criteria. Tr. at 124–25. This is so even though, as testified by one of First Advantage's executives, "a reasonable person would" conclude "with a certainty or virtual certainty that Ricky Williams who committed burglary and aggravated battery on a pregnant woman whose records First

Advantage matched with Richard Williams was not, in fact,

Richard Williams[.]" Tr. at 300.

As with the Rent-A-Center report, First Advantage sent the

report (and adjudication of ineligibility) to Winn-Dixie, tr. at 98,

and notified Plaintiff that it was reporting the records to Winn-

Dixie, tr. at 98–99. Plaintiff again disputed the criminal records

in the report, tr. at 99, and First Advantage again reopened the

investigation. After obtaining hard copies of the underlying court

reports,[10] First Advantage discovered that "Ricky" Williams's

social security number did not match Plaintiff's. As a result, First

Advantage removed those records from Plaintiff's report. Yet

again, that removal was too little, too late; Winn-Dixie had

already hired somebody else for the liquor store associate

position. Tr. at 151. Plaintiff was eventually hired by Winn-Dixie

approximately five months later. Tr. at 151, 164.

### C. Trial

After this Court dismissed some of Plaintiff's claims on

summary judgment, ECF No. 123, the remaining claims were

---

[10] One of First Advantage's executives testified that this type of public record could have been obtained prior to Plaintiff's adjudication, but it did not do so.

tried before a jury. Plaintiff presented evidence that First Advantage both willfully and negligently violated the FCRA, arguing that it ignored certain "red flags" that distinguished Plaintiff from "Ricky" Williams and consciously overrode its policies and procedures. According to Plaintiff, those decisions were made to reduce costs and ensure, in First Advantage's words, "[i]ndustry-leading turnaround times . . . ." Tr. at 256, 360.

Plaintiff and his mother testified that losing the Rent-A-Center and Winn-Dixie positions left Plaintiff feeling "horrible," wondering whether he would ever get a job, and caused headaches, lost appetite, and insomnia. Tr. at 147–54, 241–44. Plaintiff also testified that, although he obtained the 911-dispatcher position in part due to his good reputation, that other employers blindly trusted the First Advantage report's accuracy. Tr. at 150. After Plaintiff's case-in-chief, First Advantage moved for judgment as a matter of law, arguing that no reasonable jury could conclude (1) that it willfully or negligently violated the FCRA; (2) that Plaintiff was entitled to reputational damages; and (3) that Plaintiff properly mitigated his damages. Tr. at 399–426. That motion was denied as to the negligence and damages

13

arguments, and the willfulness argument was taken under advisement. Tr. at 444–45.

As for its case-in-chief, First Advantage argued that it took steps to ensure that its policies and procedures are consistently followed, *see, e.g.*, tr. at 473–74, that no screening companies require more than two matching identifiers to include a criminal record in a consumer's background report, *see, e.g.*, tr. at 383, and that no other similar companies implement tools that attempt to prevent information from appearing on the wrong consumer's record if that information was matched to another person in the past, tr. at 371. The jury apparently disagreed; it found in Plaintiff's favor and awarded him $250,000 in compensatory damages and $3.3 million in punitive damages. ECF No. 188.[11]

First Advantage now renews its pre-verdict Rule 50 motion and, in the alternative, asks for a new trial. ECF No. 207. Specifically, it argues that there is insufficient evidence from which a reasonable jury could conclude that it negligently and willfully violated the FCRA.  ECF No. 208, at 2. Further, even

---

[11] Plaintiff argued that $3.3 million was appropriate as it represents 1% of the $336.5 million that First Advantage paid when acquiring Lexis Nexis. Tr. at 332.

assuming liability, First Advantage argues that Plaintiff is not entitled to emotional-distress damages and that Plaintiff's lost-wage damages should be reduced because he failed to mitigate his damages. *Id.* at 2–3. Finally, First Advantage asserts that the jury's punitive-damages award is "manifestly unjust, arbitrary, falls far outside of constitutional limits, and must be, at the very least, greatly reduced." *Id.* at 29.

## II

Federal Rule of Civil Procedure 50 authorizes courts "to remove cases or issues from the jury's consideration when the 'facts are sufficiently clear that the law requires a particular result.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 447–48 (2000) (citation omitted). Parties may only move for judgment as a matter of law on grounds that were advanced in a pre-verdict motion. Fed. R. Civ. P. 50(b). The ultimate question "is whether the evidence is 'legally sufficient . . . to find for the party on that issue.'" *McGinnis v. Am. Home Mortg. Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting Fed. R. Civ. P. 50(a)(1)). A motion for judgment as a matter of law should only be granted "'[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable

[persons] could not arrive at a contrary verdict . . . .'" *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309–10 (11th Cir. 1988)).

## III

As to liability, First Advantage has two arguments; namely, that a reasonable jury could not find that it negligently or willfully violated the FCRA. This Court disagrees.

## A

First Advantage contends that Plaintiff failed to meet his burden in proving that it willfully violated the FCRA. An FCRA violation is willful if the defendant violates that statute with "reckless disregard." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69 (2007); *see also Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) ("A violation is 'willful' for the purposes of the FCRA if the defendant violates the terms of the Act with knowledge or reckless disregard for the law." (citing *Safeco*, 551 U.S. at 60)). A violation is deemed reckless if, objectively, it "entail[s] 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

16

In other words, the violation at issue must be "not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

The jury could have, and did, reasonably find that First Advantage willfully violated the FCRA. For example, First Advantage clearly knew of the potential for harm to those with common names. Indeed, it implemented procedures in an apparent attempt to mitigate that risk. *See* tr. at 318 (referencing the requirement that if a common-named consumer matched an individual with a different address, then an address history should be developed). The problem is that the procedures were woefully insufficient to mitigate that risk. Rather than providing all employees access to databases like Experian—which could be used to help distinguish one individual from another—First Advantage arguably padded its bank accounts by restricting that access to a limited number of individuals. Indeed, had that access been provided to all individuals, First Advantage likely would have discovered the numerous disparities—including social

17

security number, address, height, etc.—between Plaintiff and

"Ricky" Williams prior to the dispute-resolution process.

Furthermore, the jury could have reasonably concluded

that First Advantage neglected to implement procedures so that

repeat-mismatched consumers could have their record flagged to

prevent those consumers from being mismatched with the same

similarly named individual. But First Advantage says that its

system effectively "flags" records by automatically blocking all

previous charges that have been successfully disputed and only

releasing the background report to the client after it has verified

that any matched records are not being erroneously reported for a

second time. And that procedure was effective, argues First

Advantage; namely, "Ricky" Williams's cocaine charge was

blocked from the Winn-Dixie report after Plaintiff successfully

disputed that charge in the Rent-A-Center report. But that

misses the point. Recidivism rates demonstrate that it is likely—

and, quite possibly, more likely than not—that the subject of the

mismatched criminal report (here, "Ricky" Williams) will commit

another crime even after an erroneous criminal-background

report is issued. *See* Daniel S. Nagin, et al., *Imprisonment and*

*Reoffending*, 38 Crime & Just. 115, 120 (2009) ("[R]eoffending

among prison inmates is high, with rates of official recidivism often reaching 60 percent within 3 years . . . ." (citation omitted)). First Advantage not only knows about this possibility, *see* tr. at 305–06 (agreeing that "folks who commit crimes often commit other crimes"), but its procedures do nothing to prevent that harm. Indeed, assuming "Ricky" Williams persisted in his criminal endeavors, Plaintiff could continue to be erroneously matched with him for eternity, thus foreclosing—or at least, at a minimum, making it much more difficult to obtain—any future employment opportunities.

Nevertheless, First Advantage argues, and argued ad nauseam at trial, that their procedures "*did and do in fact* assure maximum possible accuracy because during the relevant time period First Advantage accurately matched criminal records with consumers 99.62% of the time." ECF No. 208, at 16 (emphasis in original). That argument is like the thirteenth chime of a clock. You not only know it is wrong, but it leads you to question everything you heard before it. It isn't First Advantage's accuracy rate as applied to all consumers that matters; it is First Advantage's accuracy rate as applied to common-name consumers. Although neither party presented definitive evidence

on that issue, it is far more likely that one would erroneously match a common-name consumer than a unique-name consumer.[12] Common sense thus suggests that many of the 14,346 "not-me" errors were for common-name consumers.

But even assuming those procedures *were* sufficient, they simply were not followed here. First Advantage's policies and procedures for common names required that "[a]dditional attempts must be made to obtain a third identifier on common names, (i.e. Robert Jones). If a third identifier cannot be located, appropriate notes should be included . . . as to attempts made, and the record reported with supervisor approval." Tr. at 314–15. For example, if a common-name consumer matches to a record containing a different address, then the adjudicator shall develop additional address-history information by using an outside resource, such as Experian. Tr. at 318–19. Had that procedure been followed, First Advantage would have learned what they later learned in the dispute process; namely, that Plaintiff was

---

[12] For example, as this Court suggested at trial, it is much more likely that First Advantage would mismatch two common-name consumers—such as John Smith or even Richard Williams—than it would "mismatch Xavier Simpatico with Mark Walker." Tr. at 404–05. Similarly, the universe of unique-name consumers is likely much larger than the universe of common-name consumers. That may also help explain First Advantage's low error rate.

not the criminal, "Ricky" Williams. Yet First Advantage consciously ignored this procedure. Tr. at 320. That evinces willfulness. *See Lee v. Sec. Check, LLC*, No. 3:09-cv-421, 2010 WL 3075673, at *12 (M.D. Fla. Aug. 5, 2010) (acknowledging that "[a] credit reporting agency cannot [merely] rely on the fact that it has established some procedures," and that those "procedures must be reasonable with respect to the particular dispute presented").

In any event, First Advantage relies on *Singletary v. Equifax Info. Servs., LLC*, No. 2:09-cv-489, 2011 WL 9133115 (N.D. Ala. Sept. 22, 2011), to argue that any FCRA violation was not willful. That case is distinguishable. The FCRA violations in that case were not caused by the defendant intentionally failing to follow its own procedures to mitigate a known risk. Nor did the defendant know with virtual certainty when preparing that report that there would be an error. In this case, however, the errors were "so prevalent and continuous that a reasonable inference can be drawn that [First Advantage] was not interested in correcting the errors and, thus, recklessly disregard[ed]" the FCRA. *Id.* at *16. Moreover, the *Singletary* court emphasized that a miniscule .00213% of the approximately 40 million credit-

disclosure requests went unfulfilled due to some sort of procedural error. *Id.* at *13 n.13. That pales in comparison to First Advantage's error rate here.

First Advantage also cites *Smith v. LexisNexis Screening Solutions, Inc.*, 837 F.3d 604 (6th Cir. 2016), to argue that it did not willfully violate the FCRA. Such reliance is misplaced.[13] The plaintiff in *Smith*—David A. Smith—was not retained by his employer after it received a criminal-background report from the defendant, which erroneously listed a felony conviction for David O. Smith. *Id.* at 607–08. The defendant argued that any FCRA violation was not willful and, in support, noted that this "single mix-up" was the first of its kind (an erroneous criminal record based on first name, last name, and date of birth). *Id.* at 610; *see also* Brief for Defendant at 26, *Smith v. LexisNexis Screening Solutions, Inc.*, 837 F.3d 604 (6th Cir. 2016) (Nos. 15-2329, 15-

---

[13] The same is true regarding *LaGrassa v. Jack Gaughen, LLC*, No. 1:09-cv-0770, 2011 WL 1257384 (M.D. Pa. Mar. 11, 2011), and *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409 (4th Cir. 2001), where the courts held that an alleged FCRA violation was not willful because a single "violation of the FCRA by itself does not amount to willful noncompliance with the FCRA." *LaGrassa*, 2011 WL 1257384, at *5; *see also Dalton*, 257 F.3d at 418 (holding that defendant did not act willfully because there was "no evidence that other consumers ha[d] lodged complaints similar to [the plaintiff's] against [the defendant]"). That is undoubtedly true. It just has no persuasive effect here; the violations at issue were not standalone FCRA violations.

2330), 2016 WL 284755, at *26 ("Smith's situation is the first time a problem has arisen by using first name, last name, and date of birth for a criminal record report."). On the other hand, the plaintiff asserted that the defendant's failure to require a middle-name match willfully violated the FCRA. *Smith*, 837 F.3d at 610.

Siding with the defendant, the Sixth Circuit held that the violation "did not result from Lexis's disregarding a high risk of harm which it should have known." *Id.* at 611. That was in part because "a single inaccuracy, without more, does not constitute a willful violation of the FCRA." *Id.* (citing *Nelski v. Trans Union, LLC*, 86 F. App'x 840, 844 (6th Cir. 2004)). Moreover, the defendant's policies and procedures "kept Lexis's dispute rate at just .2%, which is remarkably low." *Id.* at 610–11.

It is unquestionable that a single inaccuracy, by itself, does not amount to a willful FCRA violation. That premise is just inapplicable here. Unlike *Smith*, this wasn't a single inaccuracy; it was one of thousands.[14] Nor was it First Advantage's first

---

[14] In a similar vein, the *Smith* defendant's error rate can be distinguished from the one here. In *Smith*, the defendant's error rate was .2% for *all* errors in criminal-background reports (that is, not just "not-me" or "not-mine" errors). *Smith*, 837 F.3d at 607. Conversely, First Advantage's national error rate—which only implicates "not-me" or "not-mine" errors—is

FCRA violation based on its use of a first name, last name, and date of birth match; in fact, it happened *twice* to the same individual in this case.[15] That alone distinguishes this case from *Smith*. There is more. Nothing in *Smith* established either that the defendant knew about the high risk of repeat false matches (that is, a second false match with the same individual) associated with common-name consumers or that the defendant consciously disregarded its own policies and procedures in matching that particular plaintiff to an erroneous criminal-background report.

Yet the record establishes both of those facts here. First Advantage's executives and employees testified that they knew that individuals that have previously committed a crime are likely to commit another crime in the future, *see* tr. at 305–06 (acknowledging that "folks who commit crimes often commit

---

approximately double that in *Smith* (and that puts aside the Florida error rate of .51%, ECF No. 210, at 7, which was more than 2.5 times larger than the error rate in *Smith*).

[15] This Court acknowledges that there is no direct evidence in the record of other erroneous first name, last name, and date of birth matches. But given the sheer number of "not-me" or "not-mine" errors—errors where the records contained in the background report are not that of the job applicant—the jury could have reasonably inferred that others, and likely many others, have occurred. Such an inference is particularly appropriate in that the defendant in *Smith* is the same entity as First Advantage. Thus, First Advantage cannot reasonably assert that this is the first occurrence.

other crimes"), thus increasing the risk of a repeat erroneous match. Additionally, those employees testified that they knew with absolute precision that a criminal possessed the same date-of-birth and a nearly identical name as Plaintiff. Tr. at 299–300. Even worse, those same employees testified that any reasonable person preparing the Winn-Dixie report would have known with virtual certainty (if not absolute certainty) that Plaintiff, in fact, was not the "Ricky" Williams that committed aggravated battery on a pregnant person. *Id*. Moreover, as explained above, First Advantage blatantly ignored its own procedures when preparing the Winn-Dixie report. *See supra* pp. 20–21. Thus, the jury could reasonably have concluded that First Advantage acted willfully in violating § 1681e(b).[16]

## B

First Advantage next argues that no reasonable jury could conclude that it was negligent in preparing the Rent-A-Center

---

[16] *See Taylor v. First Advantage Background Servs. Corp.*, No. 15-cv-02929, 2016 WL 4762268, at *12–14 (N.D. Cal. Sept. 13, 2016) (concluding the same in a similar case against First Advantage); *see also Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 330 n. 7 (D. Conn. 2009) ("[A] reasonable jury could find that, in preparing a background investigation report for [the plaintiff] which included convictions pertaining to an individual with a different first name from a different state, [the defendant] created 'an unjustifiably high risk of harm . . . so obvious that it should [have been] known.'" (quoting *Safeco*, 551 U.S. at 68)).

and Winn-Dixie reports. For the reasons explained above—and then some—that is incorrect.[17]

The FCRA requires all agencies preparing consumer reports to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 16 U.S.C. § 1681e(b). Implicit within this requirement is that those reports contain accurate information. *Lazarre v. JPMorgan Chase Bank, N.A.*, 780 F. Supp. 2d 1330, 1334 (S.D. Fla. 2011).

But that does not mean that credit reporting agencies are strictly liable for all inaccuracies. *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991) (citations omitted). Rather, the preparing agency may only be held liable if

---

[17] First Advantage's main argument to the contrary is that by relying on two identifiers, it "me[e]t[s] or exceed[s] industry standards" and is thus acting as a reasonably prudent consumer reporting agency. ECF No. 208, at 2. The Sixth Circuit rejected that argument, *Smith*, 837 F.3d at 610, and this Court does as well. In any event, that other agencies also require two identifiers is not dispositive—it is merely evidence that the jury considered and, presumably, rejected. The jury could have concluded, for example, that the entire consumer-reporting industry violated the FCRA. *See Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 732 (6th Cir. 1980) ("Industry standards and customs are not entirely determinative of reasonableness because there may be instances where a whole industry has been negligent . . . ." (citing *Diebold Inc. v. Marshall*, 585 F.2d 1327, 1336 (6th Cir. 1978))). Because this Court finds that the jury could have reasonably concluded that First Advantage was negligent on other grounds, it need not decide that issue.

it failed to exercise reasonable care in generating that inaccurate report, *Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir. 1996); *see also Johnson v. Equifax, Inc.*, 510 F. Supp. 2d 638, 647 (S.D. Ala. 2007) ("[The plaintiff] bears the burden to establish that the procedures followed by [the defendant] were unreasonable." (citations omitted)), which is guided by reference to what a reasonably prudent person would do under the circumstances, *Davis v. Equifax Info. Servs. LLC*, 346 F. Supp. 2d 1164, 1171 (N.D. Ala. 2004) (citing *Thompson v. San Antonio Retail Merch. Assoc.*, 682 F.2d 509, 513 (5th Cir. 1982)). That is a highly fact-sensitive inquiry, and as such, is "a jury question in the overwhelming majority of cases." *Cahlin*, 936 F.2d at 1156.

Although First Advantage unsuccessfully hangs its willfulness hat on *Smith*, that same case all but dooms its negligence argument. The *Smith* court rejected the defendant's argument that this "single mix-up" did not support the jury's negligence finding. 837 F.3d at 610. That was because the "jury could conclude that a reasonably prudent CRA, when presented with . . . a common name [like David Smith], would have required additional identifying information—like a middle name—to heighten the accuracy of its report." *Id.* Moreover, when

27

preparing the criminal-background report at issue, the defendant possessed a credit report for the plaintiff—David A. Smith— which could have been cross-referenced with the name on the criminal record—David Oscar Smith. *Id.* Nonetheless, it failed to do so.

That case is on all fours here. First Advantage could have required an additional identifier—like an address—to further ensure the accuracy of its reports. Ironically, that *was* First Advantage's policy for common-name consumers. Tr. at 317–19. It just failed to follow it. Tr. at 318–20. That First Advantage, unlike in *Smith*, had a policy to mitigate those concerns is of no matter. If an agency can be found negligent for failing to adopt a policy requiring additional identifiers for common names, *Smith*, 837 F.3d at 610, it certainly could also be found negligent for ignoring that policy altogether, *see* § 1681e(b) (applying "*[w]henever* a consumer reporting agency prepares a consumer report" (emphasis added)); *see also Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 696 (N.D. Ga. 2012) (defining "whenever" for purposes of another FCRA provision to mean "'at any time'"). A policy adopted in name-only is no policy at all.

To make matters worse, like the defendant in *Smith*, First

Advantage possessed and reviewed information establishing that Plaintiff was not the subject of the underlying criminal allegations in the Winn-Dixie report. In preparing that report, one of First Advantage's employees reviewed a Florida Department of Corrections website which showed that "Ricky" Williams—who had committed the crimes listed in the criminal-background report—was incarcerated at the Broward County Jail. Tr. at 274, 290–91. Moreover, "Ricky" Williams's height was listed at 6'2". Tr. at 290. Yet First Advantage knew from the Rent-A-Center dispute that Plaintiff—who quite clearly was actively pursuing employment opportunities and not sitting in jail—had spent his entire life over 300 miles away in Chiefland, Florida, tr. at 545, and was 5'10" tall, tr. at 126. An executive of First Advantage even testified that a reasonable person would have known with "certainty or virtual certainty" that Plaintiff was not the subject of that criminal report. Tr. at 300. Nonetheless, it failed to include this information in the Winn-Dixie report and, again, erroneously mismatched Plaintiff with "Ricky" Williams.

One last distinction makes the negligence issue presented in this case even easier to decide than that presented in *Smith*.

29

The record is replete with evidence that a consumer's social security number is the quintessential identifier. *See* tr. at 269 (explaining that social security numbers are, "[o]ther than fingerprints, . . . the most unique identifier"). Thus, it would be highly detrimental, if not fatal, for a criminal-background report to erroneously associate a social security number with a consumer's criminal-background report. Yet that is precisely what happened here; Plaintiff's Rent-A-Center report erroneously listed his social security number as one of the identifiers matching him to the cocaine charges. Tr. at 287. The jury could have concluded that a reasonably prudent agency would have cross-referenced Plaintiff's social security number with the relevant charges to verify that (1) the charges listed a social security number, and (2) that number matched Plaintiff. By failing to do so, the jury could have concluded that First Advantage negligently violated the FCRA.

### III

Similarly, First Advantage makes three arguments regarding compensatory damages. First, First Advantage argues that the evidence cannot support the emotional-distress damages generally. Second, First Advantage argues the same as applied to

the reputational damages specifically. Third, First Advantage argues that Plaintiff's lost-wage damages are unwarranted because he failed to mitigate those damages. These arguments are misdirected.

## A

First Advantage first argues that the trial testimony does not support the emotional-distress damages. That argument is arguably procedurally improper and, at any rate, unpersuasive.

As a threshold matter, First Advantage's motion is procedurally worrisome. Rule 50(a) motions for judgment as a matter of law may be brought "at any time before the case is submitted to the jury." In contrast, Rule 50(b) "expressly provides only for *renewed* JMOL motions, and thus a district court can grant a Rule 50(b) motion 'only on grounds advanced in the preverdict [Rule 50(a)] motion.'" *McGinnis*, 817 F.3d at 1260 (citation and footnote omitted). Because that rule is harsh, though, courts construe those motions liberally. *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986) (citing *Quinn v. Sw. Wood Prods., Inc.*, 597 F.2d 1018, 1025 (5th Cir. 1979)). Thus, courts may consider Rule 50(b) motions if the grounds asserted are "closely related" to those previously argued

in a Rule 50(a) motion. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998) (citing *Nat'l Indus., Inc.*, 781 F.2d at 1549–50). On the other hand, if the new and old grounds vary greatly, the court must not "ambush" the Seventh Amendment right by relying on the new grounds to set aside the jury's verdict. *Id.* (citing *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 845–46 (5th Cir. 1975)).[18]

First Advantage moves for judgment as a matter of law as to Plaintiff's emotional-distress damages, including both ordinary emotional-distress damages and reputational damages. ECF No. 208, at 23–26. But in its Rule 50(a) motion, First Advantage only moved to dismiss the "reputational damages component" of the emotional-distress damages. Tr. at 421. That is problematic. This would be an easier decision if, for example, First Advantage's Rule 50(a) motion encompassed Plaintiff's emotional-distress damages generally, yet the argument's focus was on the reputational-damages component. *See, e.g.*, *Shepherd v. Honda of Am. Mgf., Inc.*, 160 F. Supp. 2d 860, 866 (S.D. Ohio 2001)

---

[18] Decisions of the Fifth Circuit prior to October 1, 1981, are binding within the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

(addressing a Rule 50(b) motion on the merits as "closely related"
because it simply addressed each element at issue in the Rule
50(a) motion).

Instead, First Advantage based its Rule 50(a) emotional-
distress damages motion on the sole ground that Plaintiff failed
to prove reputational damages. *See* tr. at 420 ("We also move for
dismissal with prejudice to plaintiff's claim for compensatory
damages in the form of damages to his reputation."). First
Advantage stressed that "Mr. Williams had a good reputation
and that a good reputation is at least part of the reason why he
secured a full-time job with benefits at the Levy County Sheriff's
Office, you know, seven months after being mismatched in a
consumer report." Tr. at 420–421. At no point did First
Advantage reference Plaintiff's testimony that he was upset or
his mother's corroboration of that testimony. Moreover this Court
specifically asked Plaintiff to respond to the reputational-
damages argument, tr. at 429, and ruled only on that aspect of
the emotional-distress damages, tr. at 444. Even under Rule 50's
liberal construction, this Court would be inclined to rule that
First Advantage's motion as to non-reputational emotional-
distress damages raises "new grounds" which cannot be

considered here. *See Baker v. Soil Tech Distribs., Inc.*, No. 07-22254-CIV, 2009 WL 195938, at *2 (S.D. Fla. Jan. 26, 2009) (denying a Rule 50(b) motion because it was "based on 'new grounds' which were not raised in Defendant's Rule 50(a) motion").

Nonetheless, even if those grounds are not "new grounds," First Advantage's motion is unconvincing on the merits. FCRA plaintiffs may recover emotional-distress damages. *See Thomas v. Gulf Coast Credit Servs., Inc.*, 214 F. Supp. 2d 1228, 1235 (M.D. Ala. 2002) (citing *Stevenson v. TRW, Inc.*, 987 F.2d 288, 296 (5th Cir. 1993)); *see also Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995) ("'[A]ctual damages' may include humiliation and mental distress, even in the absence of out-of-pocket expenses." (collecting cases)). But a claim for emotional-distress damages must be supported by something more than the plaintiff's bare allegations. *See Rambarran v. Bank of Am., N.A.*, 609 F. Supp. 2d 1253, 1268 (S.D. Fla. 2009) ("[A]n FCRA plaintiff's 'testimony of emotional distress must be coupled with additional evidence [of] . . . some kind of actual or genuine injury.'" (citations omitted)). That "something more" can take the form of testimony regarding "the surrounding circumstances or

other 'evidence of genuine injury, such as the evidence of the injured party's conduct and the observations of others.'" *Riley v. Equifax Credit Info. Servs.*, 194 F. Supp. 2d 1239, 1245 (S.D. Ala. 2002) (quoting *Cousin v. Trans Union Corp.*, 246 F.3d 359, 371 (5th Cir. 2001)); *see also Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 940 (5th Cir. 1996) (explaining that damages stemming from intangible loss require "a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award" (citing *Carey v. Piphus*, 435 U.S. 247, 264 (1978))).

The evidence presented at trial is more than sufficient to support the emotional-distress damages. Plaintiff testified that he was "highly upset" after receiving the Rent-A-Center report, in part because he "would never commit a crime like [selling cocaine]." Tr. at 125. And the Winn-Dixie report only made matters worse. Indeed, Plaintiff testified that report "[h]ad [him] feeling horrible" and caused him to think that he would "never get a job." Tr. at 148. He was gravely concerned that any prospective employer who used First Advantage's services would blindly trust an erroneous report, thus leading that employer to "think that [he was] hiding something." *Id*. Just the mere

possibility that he could be dragged through this rigmarole again "ma[de] [him] cringe." Tr. at 149. This distress was not asymptomatic; Plaintiff suffered physical harm including insomnia, headaches, and stomach distress. Tr. at 154, 244.

First Advantage nonetheless asserts that Plaintiff's emotional-distress damages are only supported by "self-serving, vague, and conclusory testimony presented at trial." ECF No. 208, at 23. That couldn't be further from the truth. Unlike many of the cases relied on by First Advantage,[19] Plaintiff's testimony was corroborated by evidence "'reasonably and sufficiently explain[ing] the circumstances' surrounding [his] emotional injuries."[20] *Smith*, 837 F.3d at 611 (quoting *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 361 (6th Cir. 2005)). For example, Plaintiff's mother testified that the erroneous reports "bothered him" and that it was a "rough" experience for him. Tr. at 243.

---

[19] Namely, *Ruffin–Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603 (7th Cir. 2005), *Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir. 2001), and *Riley v. Equifax Credit Info. Servs., Inc.* 194 F. Supp. 2d 1239 (S.D. Ala. 2002).

[20] Plaintiff also relies on *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir. 1984), to argue that the emotional-distress award cannot stand. That case too is distinguishable. The plaintiff in *Wilson* did not provide evidence as to any physical symptoms of his emotional distress. *See id.* at 1549 (noting that the most relevant testimony is that Plaintiff "was frustrated and angry"). The opposite is true here.

Moreover, she testified that Plaintiff lost his appetite and had difficulty sleeping. Tr. at 244. That testimony substantiated Plaintiff's emotional-distress damages with the necessary degree of specificity. *See Smith*, 837 F.3d at 611 (upholding emotional-distress damages when the plaintiff's testimony was corroborated by testimony from his wife); *see also Cousin*, 246 F.3d at 371 (acknowledging that intangible loss—including emotional distress—requires "'a degree of specificity which may include corroborating testimony . . . in support of the damage award'" (quoting *Patterson*, 90 F.3d at 940)).

One final note on this point. In so ruling, this Court makes plain that it is not basing its decision off a cold, lifeless record. Nor is it making this decision on a whim. Rather, this Court makes its decision after enjoying "the 'unique opportunity to consider the evidence in the living courtroom context.'" *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1335 (11th Cir. 1999) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996)). That Plaintiff did not break down in tears or lose his composure while testifying is irrelevant. It is relevant, though, that Plaintiff's emotional distress was palpable to any person in the courtroom. This Court saw the pain in Plaintiff's eyes. It saw

the frustration. It saw the fear that this could happen again. The jury enjoyed that opportunity as well, and this Court was able to observe their reaction first-hand. It was abundantly clear that Plaintiff's testimony had an impact on them, and their award should not be disturbed. *See Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1349 (11th Cir. 2000) ("As we have observed, '[t]he standard of review for awards of compensatory damages for intangible, emotional harms is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses.'" (quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999))); *Bozeman v. Pollock*, No. 14-CIV-60493, 2015 WL 5016510, at *11 (S.D. Fla. Aug. 25, 2015) ("Of important note is the deference given to a jury's determination of compensatory damages. . . . Further, '[t]he Seventh Amendment prohibits re-examination of a jury's determination of the facts, which includes its assessment of the extent of the plaintiff's injuries.'" (quoting *Peer v. Lewis*, No. 06-60146-CIV, 2008 WL 2047978, at *4 (S.D. Fla. May 13, 2008))).

## B

Similarly, First Advantage argues that Plaintiff failed to

present evidence corroborating any reputational-damages award. The argument goes as follows. Plaintiff eventually obtained a full-time position with the Levy County Sheriff's Office, in part due to his good reputation; thus, that reputation could not have *possibly* been damaged and any award is unjustified. In the words of ESPN College Gameday's Lee Corso, "Not so fast, my friend!" First, the jury could have concluded that it wasn't Plaintiff's good reputation that led to the position with the Levy County Sheriff's Office—it was his father's. *See* tr. at 170 (showing that Plaintiff's and his father's good reputation in the community helped "to get that job with the sheriff's department"). Second, even assuming Plaintiff's reputation earned him that position, it could have been diminished in other respects. For example, Plaintiff testified that the Rent-A-Center manager's "demeanor changed" after the criminal-background report was issued because he trusted its accuracy. Tr. at 150. Plaintiff also testified that this is a small community where everyone knows one another. While it may not have been reasonable for the jury to infer that others in the community heard about this incident and trusted the report if Plaintiff lived in, say, Atlanta, Jacksonville, or Miami, that inference is reasonable given

Chiefland's small size and rural nature. Indeed, the jury's finding is particularly appropriate in that this case was tried in Gainesville, Florida—a small community. Accordingly, even if Plaintiff's good reputation (and not his father's) earned him the position with the Levy County Sheriff's Office, the jury could have reasonably concluded that it was nonetheless tarnished.

C

First Advantage argues that the lost-wage damages should be reduced because Plaintiff failed to mitigate his damages and the jury erred in relying on Plaintiff's inconsistent and insidious trial testimony. Unfortunately for First Advantage, that argument is unsound on multiple grounds.

Plaintiffs in employment-related actions are generally "'required to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position []he was denied.'" *Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1272 (11th Cir. 2013) (quoting *Smith v. Am. Serv. Co. of Atlanta*, 796 F.2d 1430, 1431 (11th Cir. 1986)). Plaintiff therefore had a duty to seek "employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status" as he would have had with the Rent-A-

Center position. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991), *superseded by statute on other grounds as recognized in Munoz*, 223 F.3d at 1347. The failure to mitigate damages is an affirmative defense and, as such, First Advantage bore the burden of establishing that defense at trial. *Munoz*, 223 F.3d at 1347.

Preliminarily, this Court is not convinced that Plaintiff's testimony was inconsistent at all. At his deposition, Plaintiff testified that he "couldn't [work as an emergency dispatcher], you know, the people committing suicide and then the phone calls, people cursing and all that." Tr. at 172. He also testified that he "tried to stay and just couldn't do it. Because Ms. Capps had asked [him] did [he] want to continue, you know, because once [he] g[o]t in there and, you know, complete[d] the Academy and [he] decide[d] to quit, [he] would have to reimburse them all that training money." Tr. at 173. That is not inconsistent with Plaintiff's trial testimony, where he testified that he was going to be let go by his supervisor, Ms. Capps, because he "wasn't meeting requirements and that they had to let [him] go, so [he] just left the Academy." Tr. at 136. No matter how you slice it, the

testimony supports the conclusion that Plaintiff did not leave of his own volition; rather, he left at the behest of Ms. Capps.

Moreover, even assuming Plaintiff's testimony was inconsistent, which it was not, that does not justify stripping him of the jury's lost-wage award. First Advantage argues the contrary and, in support, cites *Stegall v. Audette*, 212 F. App'x 402 (6th Cir. 2006). That case—which addressed an appeal of an order granting summary judgment—holds no weight here. *Id.* at 403. There, the Sixth Circuit held that "no reasonable jury could" find in the plaintiff's favor given the conflicting testimony. *Id.* at 405.

But that is not the case here. This is not a hypothetical question; a reasonable jury, in fact, *found* in Plaintiff's favor. That is so even after First Advantage forcefully cross-examined Plaintiff on that issue and later argued in closing that Plaintiff's trial testimony was self-serving and should be accorded no weight. *See* tr. at 592. The jury—as they should have—considered First Advantage's cross-examination and its closing argument. *See Othman v. City of Chicago*, No. 11-cv-5777, 2016 WL 612809, at *5 (N.D. Ill. Feb. 16, 2016) (refusing to grant a new trial based on allegedly inconsistent testimony because "the jury was made

aware of the allegedly inconsistent testimony on multiple occasions, and was thus given the opportunity to consider Plaintiffs' argument during its deliberations"); *see also Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1177 (11th Cir. 2005) (asserting that courts "do not assume the jury's role of weighing conflicting evidence or inferences, or of assessing the credibility of witnesses" (citing *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1144–45 (11th Cir. 2002))); *Iglesias v. J.C. Penney Corp.*, No. 8:09-cv-1608, 2010 WL 4854973, at *5 (M.D. Fla. Nov. 20, 2010) (noting that inconsistent testimony does "not justify dismissal" but rather provides opposing counsel "with potent topics for cross-examination and fertile ground for impeachment" (citing *Bologna v. Schlanger*, 995 So.2d 526, 538 (Fla. 5th DCA 2008))). The jury just didn't buy it. First Advantage's beef, therefore, isn't with the jury's lost-wages award; it's with the efficacy of its own arguments. Frustration alone is not a valid reason to ignore the jury's award and reduce Plaintiff's lost-wages damages.

## IV

Finally, First Advantage contends that the $3.3 million punitive-damages award is unconstitutional and, at the very

least, must be reduced. Given the reprehensibility of First Advantage's actions and the need to deter it from engaging in this type of conduct in the future, this Court finds otherwise.

Punitive-damage awards—which are primarily tools of deterrence and retribution—are limited in magnitude by the "'[e]lementary notions of fairness'" contained in the Due Process Clause. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996)). "[G]rossly excessive or arbitrary punishments" are therefore disallowed, as they "further[] no legitimate purpose and constitute[] an arbitrary deprivation of property." *Id.* at 416–17 (citations omitted). In determining whether a punitive-damage award is unconstitutionally excessive, courts consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citing *Gore*, 517 U.S. at 575).

Because the third guidepost is of no real utility in FCRA cases,[21] this Court will only focus on the first two.

## A

The first guidepost is the degree of reprehensibility, and it "is considered to be the 'most important' indicator of the reasonableness of the damage award." *Sepulveda v. Burnside*, 432 F. App'x 860, 865 (11th Cir. 2011) (quoting *State Farm*, 538 U.S. at 419). In making this determination, courts weigh the following five factors: (1) whether "the harm caused was physical as opposed to economic"; (2) whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether "the conduct involved repeated actions or was an isolated incident"; and (5) whether "the harm was the result of intentional malice, trickery, or deceit,

---

[21] *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 724 (3d Cir. 2010) ("[W]e agree with the parties that the third guidepost is not useful in the analysis of punitive damages here as there is no 'truly comparable' civil penalty to a FCRA punitive damages award."); *Saunders v. Branch Banking and Tr. Co. of Va.*, 526 F.3d 142, 152 (4th Cir. 2008) ("Congress specifically chose not to limit punitive damages in suits brought by private parties . . . . Thus, we agree . . . that the third guidepost provides 'little assistance' in FCRA suits." (quoting *Bach*, 486 F.3d at 154 n.1)); *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255, 1265 (N.D. Ala. 2011) ("The court therefore finds the third factor to be of limited usefulness.").

or mere accident."[22] *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77). While there is no set quota on the number of factors required to support a finding of reprehensibility, "reprehensibility grows more likely as more factors are present." *Sepulveda*, 432 F. App'x at 865 (citing *State Farm*, 538 U.S. at 419).

The first factor weighs in Plaintiff's favor. First Advantage strongly disagrees, arguing that the harm caused to Plaintiff, if any, was "purely economic rather than physical." ECF No. 208, at 31. The Eleventh Circuit says otherwise. Although Plaintiff's injuries at first glance appear to be merely economic, for purposes of the reprehensibility analysis, psychological harm suffices. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008) ("One factor that suggests that the misconduct of [the defendant] was reprehensible is that [the plaintiff] suffered both economic harm and emotional and psychological harm."). Thus,

---

[22] Some courts have stated that, in FCRA cases, the first two factors in the *State Farm* reprehensibility analysis—whether the harm was physical or economic and whether the conduct evinced an indifference to or a reckless disregard of the health or safety of others—"must be given less, or no weight than the remaining factors." *Saunders v. Equifax Into. Servs., LLC*, 469 F. Supp. 2d 343, 351 (E.D. Va. 2007). The thrust of that ruling was to ever so slightly tilt the scales in plaintiffs' favor, thus, effectively, leveling the playing field. Given that both those factors weigh in Plaintiff's favor, this Court need not decide whether it agrees. *See infra* pp. 46–49.

that Plaintiff was "feeling horrible" and thought he would "never get a job," tr. at 148, supports his reprehensibility argument, *see Goldsmith*, 513 F.3d at 1283 (noting that the fact that the defendant felt "'hurt' and 'upset'" weighed in favor of reprehensibility); *see also Daugherty v. Ocwen Loan Serv., LLC.*, No. 5:14-cv-24506, 2016 WL 6656750, at *3 (S.D. W. Va. Oct. 12, 2016) (finding that the first prong weighed in the plaintiff's favor in an FCRA case due to the "emotional toll that [the defendant's] conduct inflicted upon him"). That Plaintiff never sought treatment for his emotional turmoil holds little-to-no persuasive value. *See Miller v. Equifax Info. Servs., LLC*, No. 3:11-cv-01231, 2014 WL 2123560, at *4 (D. Ore. May 20, 2014) (holding in an FCRA case that the first factor weighed in Plaintiff's favor based on emotional distress even though "there was not any trial evidence . . . that [the plaintiff] sought [medical attention] for her emotional distress"). In any event, Plaintiff actually *did* suffer physical harm; namely, he lost his appetite and suffered from insomnia. Both of those harms, over time, can lead to serious illness.

At bottom, First Advantage invited the jury and now invites this Court to devalue the impact that the loss of

employment has on an hourly employee. This Court makes plain that not a jury, judge, or reviewing court should minimize the suffering or humiliation that loss can inflict. Of course, it may be easier for, say, a disbarred attorney or an injured surgeon to expand on that difficulty while testifying. But that doesn't mean that a low-wage, hourly employee is immune to the bite of unemployment. Nor does one have to weep and wail to felt that bite. *See supra* pp. 37–38.

The second factor also weighs in Plaintiff's favor. First Advantage contends the opposite, arguing that because Plaintiff's injuries are only economic, that it could not have acted indifferently or with reckless disregard to the health or safety of others. ECF No. 208, at 32. That belies logic. Unlike the other FCRA cases cited by First Advantage—which involved a loss of credit, *see, e.g.*, *Bach*, 149 F. App'x at 361—this case does not involve a mere reduction in buying power. Nor does it involve an erroneous report causing a high-earning individual to choose one of many employment options available to them—for example, an attorney switching firms or a physician switching practices. First Advantage's willful FCRA violations put Plaintiff's livelihood at stake. Losing the Rent-A-Center and Winn-Dixie employment

48

opportunities affected Plaintiff's ability to obtain health insurance. The jury could also have reasonably inferred that it affected his ability to pay for basic necessities like food, water, shelter, and clothing. And, in a very real way, it affected his mental health and his ability to eat and sleep.

Moreover, when evaluating this factor, courts consider "the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993). First Advantage hasn't erred in this fashion once or twice; it has done so, quite literally, thousands of times in the last few years alone. Tr. at 94. The harm to those consumers (or those in the future) could be greater or lesser than that suffered by Plaintiff. Thus, the jury could have reasonably considered Plaintiff as an example of the harm that First Advantage is prepared to inflict on thousands of other consumers. *See, e.g.*, *Miller*, 2014 WL 2123560, at *5 (accepting the argument that "the jury could have regarded [the plaintiff] as an 'examplar of the harm that [the defendant] is prepared to inflict on many other consumers'"). First Advantage's willful FCRA violations thus evinced an indifference or reckless disregard for the health or safety of others.

49

Similarly, the third factor weighs in Plaintiff's favor. It doesn't matter, as First Advantage asserts, that Plaintiff was able to secure alternative employment or that he was eventually hired by Winn-Dixie months later. ECF No. 208, at 32. The focus should not be on the long-term effect of First Advantage's violations; rather, it should be on Plaintiff's vulnerability at the time of those violations and shortly after them. Plaintiff had little-to-no income when he applied for the Rent-A-Center and Winn-Dixie positions.[23] Indeed, that is the case for most people who are seeking employment; many are likely seeking employment because they, in fact, are unemployed. Those that are seeking employment and subject to criminal-background checks are therefore almost certainly of limited means and are exposed to the reckless indifference or ill will of a large corporation. This case is even more compelling in that Plaintiff— a thirty-five year old man—was of such limited means that he still lived at home with his mother. Plaintiff was therefore, without a doubt, financially vulnerable. *See Goldsmith*, 513 F.3d

---

[23] Plaintiff testified that he also worked part-time at two different funeral homes as a graphic designer to make ends meet. Tr. at 112–14. The pay from those positions fluctuated from $200 to $700 per week and was dependent on that week's death rate. Tr. at 114.

at 1283 (holding that the Plaintiff was financially vulnerable because he "had to borrow money" after being terminated).

The fourth factor strongly weighs in Plaintiff's favor. Again, First Advantage asserts that this "was an anomalous case" that is "exceedingly rare." ECF No. 208, at 32. 14,346 people may argue otherwise. Tr. at 94; *see also Gore*, 517 U.S. at 576–77 (noting that, when considering the fourth factor, courts should review whether defendant's actions "formed part of a nationwide pattern of tortious conduct"). That First Advantage allegedly "has designed and implemented standard operating procedures" to prevent these inaccuracies is also unpersuasive. ECF No. 208, at 32. First, this Court's willfulness ruling suggests otherwise; the jury reasonably concluded that First Advantage has done nothing to ameliorate the risk faced by common-name consumers. First Advantage, for example, had to strike a balance between accuracy and profit. It arguably chose the latter—First Advantage seems to have padded its wallet rather than providing each adjudicator with access to a credit-reporting bureau like Experian. And in doing so, First Advantage—a multi-million dollar corporation—shifted its costs to defenseless, vulnerable consumers. That is both shocking and disgraceful.

Second, even putting that aside, First Advantage's .38% inaccuracy rate is, quite frankly, unflattering. At risk of being repetitive, this happened *twice* to the same person over the course of thirteen months. Either Plaintiff is woefully unlucky, or First Advantage is just not very good at conducting criminal-background checks for common-name consumers. The latter is far more likely. Unfortunately for First Advantage, close enough for government work is not a valid defense.

The final factor is, at best, neutral. First Advantage is correct that there is no evidence that it "acted out of intentional malice, trickery, or deceit." ECF No. 208, at 32. But its actions weren't a "mere accident", *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77), either, *see supra* pp. 16–25 (ruling that First Advantage's FCRA violation was willful). More importantly, Congress explicitly allowed FCRA punitive-damage awards even in the absence of intentional malice, trickery, or deceit. *See Soroka v. Homeowners Loan Corp.*, No. 8:05-cv-2029, 2006 WL 4031347, at *2 (M.D. Fla. June 12, 2006) (explaining that an FCRA plaintiff doesn't have to show "'malice or evil motive'" to warrant a punitive-damages award (quoting *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998))). This factor

therefore has little persuasive value.

As a result, four of the *State Farm* reprehensibility guideposts weigh in Plaintiff's favor, and the fifth is neutral. That is strong evidence that First Advantage's conduct was sufficiently reprehensible to support the punitive-damage award. *See State Farm*, 538 U.S. at 419. Additionally, although *State Farm* does not require this Court to consider it, another piece of evidence sheds light on the degree of reprehensibility. Plaintiff suggested a $1,080,000 to $3,300,000 range for the punitive-damage award in his closing argument. Tr. at 564. In fact, he first suggested the low-end of that range, stating that it was "appropriate" to make First Advantage "change their ways." Tr. at 563. Moreover, Plaintiff stressed that the $3,300,000 figure was the "high end" of possible punitive damages. Tr. at 564. Nonetheless, the jury awarded Plaintiff the largest possible award that was suggested. Impliedly, the jury felt that First Advantage's conduct was reprehensible; this Court can find no evidence to justify setting that finding aside.

## B

The second guidepost considers the ratio of actual harm suffered by the plaintiff (as measured by the amount of

53

compensatory damages) to the punitive-damage award. *State Farm*, 538 U.S. at 424. Punitive damages must be "'both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.'" *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (quoting *State Farm*, 538 U.S. at 426). The proper inquiry therefore "is 'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *Gore*, 517 U.S. at 581 (quoting *TXO Prod. Corp.*, 509 U.S. at 460) (emphasis in original).

Although the ratio of punitive to compensatory damages is important, *Sepulveda*, 432 F. App'x at 866 (citing *State Farm*, 538 U.S. at 425), the Supreme Court has opted not to announce a bright-line rule regarding the tolerable ratio. Thus, while "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 425, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards if, for example, a particularly egregious act has resulted in only a small amount of economic

damages." *Gore*, 517 U.S. at 582. A multi-digit multiplier is particularly appropriate when there is "a substantial need for deterrence" or where the defendant's conduct "was exceedingly reprehensible." *Goldsmith*, 513 F.3d at 1284; *see also Daugherty*, 2016 WL 6656750, at *4 (upholding a 408:1 punitive-damages award ratio in an FCRA case because it "'serve[d] as a meaningful deterrent' to [the defendant's] reprehensible conduct (quotation omitted)).

   The 13.2:1 ratio of punitive to compensatory damages in this case is not unconstitutionally excessive. Punitive damages are designed to deter. *See U.S. EEOC v. W&O, Inc.*, 213 F.3d 600, 614 (11th Cir. 2000) (citing *Gore*, 517 U.S. at 584). But a strict application of the *State Farm* single-digit multiplier formula would not adequately deter First Advantage's misconduct. Indeed, "sometimes a 'bigger award is needed to attract the . . . attention of a large corporation' in order to promote deterrence effectively." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004) (quoting *Johansen*, 170 F.3d at 1338). That is particularly so when the defendant is "a large and extremely wealthy . . . corporation." *Johansen*, 170 F.3d at 1338.

   First Advantage may say that it "deeply regret[s] the fact

that . . . the background reports [it] prepared on Mr. Williams contained information which was mismatched to him on somebody named Ricky Williams." Tr. at 572. But this Court is quite concerned that First Advantage has not gone so far to even hint that it plans to change its procedures to address this type of problem. It thus appears that First Advantage made a business decision to shift the burden to more than 14,000 innocent consumers to ensure the quick turnaround and low price that earned it a large market share. What is so pernicious is that First Advantage will continue shifting that burden—and, by extension, strip thousands of qualified low-wage, hourly employees of job opportunities—so long as it makes good business sense to do so.

In these types of cases, the *State Farm* single-digital multiplier formula provides First Advantage a perverse incentive to persist in its burden-shifting strategy. Of course, a single-digit multiplier may be appropriate in cases involving high-wage employees like doctors, lawyers, or federal judges. That is because both the compensatory-damages award and the punitive-damages award would be much higher. But the opposite is true in cases involving low-wage, hourly employees. Say, for example, a prospective low-wage, hourly employee loses their position due to

an erroneous criminal-background report and suffers $5,000 in lost wages. Under the *State Farm* approach, a $20,000 punitive-damage award would be "close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425 (citing *Haslip*, 499 U.S. at 23–24). But pruning damages in such a fashion would effectively endorse First Advantage's morally untenable business decision. While the $3.3 million punitive-damages award in this case may not make the company newsletter and only amounts to 1% of the $336 million that First Advantage paid to acquire Lexis Nexis, tr. at 563, it should, at a minimum, "attract the attention of whomever is in charge of the corporation's daily decisions . . . ." *Johansen*, 170 F.3d at 1338.

Moreover, when compared to other punitive-damage awards, this is not the type of "breathtaking" award that courts have repeatedly struck down. *See, e.g.*, *State Farm*, 538 U.S. at 428–29 (striking down a 145:1 punitive-damages award ratio); *Gore*, 517 U.S. at 582–83 (disapproving of a 500:1 punitive-damages award ratio). It is much closer to the single-digit multiplier formula announced in *State Farm*, and pales in comparison to other awards that have been approved by the

Eleventh Circuit.[24] *Kemp*, 393 F.3d at 1365 (reducing a punitive-damage award from 8,692:1 to 2,173:1); *Johansen*, 170 F.3d at 1339 (upholding a 100:1 punitive-damage award ratio). Accordingly, the punitive-damage ratio is within constitutional bounds.

The *State Farm* guideposts paint a clear picture. The jury's punitive-damage award in this case is not unconstitutionally excessive. As a result, this Court will not set it aside.

V

In the alternative, First Advantage moves for a new trial. "A party may include an alternative request for a new trial under Rule 59 in its Motion for Judgment as a Matter of Law." *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 101 F. Supp.

---

[24] First Advantage argues that other FCRA punitive-damage awards in this circuit involved worse conduct but resulted in a much lower punitive-to-compensatory ratio and, in support, cites *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255 (N.D. Ala. 2011). ECF No. 208, at 34. But that case did not necessarily involve worse conduct. There, the defendant "stood by its faulty system for years, insisting its procedures are reasonable, in the face of obvious evidence otherwise." *Brim*, 795 F. Supp. 2d at 1263. That is the case here too. Indeed, over 14,000 consumers have suffered similar injuries due to First Advantage's embarrassingly deficient practices and procedures. Moreover, as explained above, this Court isn't the first to hold that First Advantage's policies and procedures violate the FCRA and, unless it changes those, this Court certainly won't be the last. Consequently, the jury apparently believed that a higher punitive-damage award was necessary to sufficiently "deter similar acts in the future," and the jury "use[d] reason in setting the amount." Tr. at 538. That award was rational and should not be disturbed.

3d 1201, 1215 (N.D. Fla. Mar. 31, 2015) (Rogers, J.). Courts may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a), including on grounds that "'the verdict is against the clear weight of the evidence or will result in a miscarriage of justice . . . .'" *Lipphardt*, 267 F.3d at 1186 (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)). In determining whether a new trial is warranted, the trial court must "independently weigh[] the evidence" favoring the jury's verdict against the evidence in favor of the moving party. *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982) (citing *Rabun v. Kimberly–Clark Corp.*, 678 F.2d 1053, 1060 (11th Cir. 1982)). The decision to grant a new trial is solely within the trial court's discretion. *Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999) (citations omitted).

As required under Rule 59, this Court has independently weighed the evidence and finds that the jury's conclusion that First Advantage willfully and negligently violated the FCRA, *see supra* pp. 16–30, and that the compensatory-damages award, *see supra* pp. 30–43, and the punitive-damages award, *see supra* pp. 43–58, are not against the clear weight of evidence. First

Advantage's request for a new trial is thus due to be denied.

Accordingly,

**IT IS ORDERED:**

Defendant's Motion for Judgment as a Matter of Law or New Trial, ECF No. 207, is **DENIED.**

**SO ORDERED on March 2, 2017.**

**s/Mark E. Walker           **
**United States District Judge**