**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 09, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  17-11447-GG
Case Style:  Richard Williams v. First Advantage Background Se
District Court Docket No:  1:13-cv-00222-MW-GRJ

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this
day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing
en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for
rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules.
Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and
an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all
persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In
addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for
rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on
the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for
writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature
block below. For all other questions, please call Joseph Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11447

_____

D.C. Docket No. 1:13-cv-00222-MW-GRJ

RICHARD ALEXANDER WILLIAMS,

Plaintiff-Appellee,

versus

FIRST ADVANTAGE LNS SCREENING SOLUTIONS INC,
f.k.a. LexisNexis Screening Solutions Inc., et al.

Defendants,

FIRST ADVANTAGE BACKGROUND SERVICES CORPORATION,
a Florida Corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 9, 2020)

Before MARTIN, JULIE CARNES, and O'SCANNLAIN,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

In this Fair Credit Reporting Act ("FCRA") case, First Advantage Background Services Corporation ("Defendant") appeals the denial of its motion for judgment as a matter of law, or, in the alternative, motion for a new trial or remittitur. On appeal, Defendant asserts that the jury's $250,000 compensatory damages award should be vacated because Richard Alexander Williams ("Plaintiff") failed to show evidence of reputational harm. Defendant also contends that it was entitled to judgment as a matter of law on Plaintiff's claim that it willfully violated the FCRA. Finally, Defendant argues that the excessiveness of the jury's $3.3 million punitive damages award rendered it unconstitutional under the Due Process Clause. After careful review, and with the benefit of oral argument, we affirm the district court's denial of Defendant's motion for judgment as a matter of law to the extent it challenged the reputational harm claim and the willfulness claim. We, however, vacate the jury's punitive damages award and remand the case to the district court to enter a judgment awarding Plaintiff $1 million in punitive damages.

---

[*] Honorable Diarmuid F. O'Scannlain, United States Circuit Judge for the Ninth Circuit, sitting by designation.

## BACKGROUND

I.     **Defendant's Procedures**

Defendant is a consumer reporting agency that prepares criminal background reports on individuals.  In 2012 Defendant prepared around 9 to 10 million background reports nationally, and in 2013 it prepared 10 to 12 million background reports nationally.[1]  Defendant charged $11 to $12 for each report.  As to how Defendant prepares these reports, Defendant maintains a national criminal file database that contains criminal records from around the country.  When a customer orders a criminal background check, the consumer's information is passed through an automated search of this database.

Defendant's standard operating procedures for people with non-common names require a match of at least two identifiers—such as name, date of birth, social security number, or driver's license number—before attributing to the subject of a background investigation the criminal record of a person with the same, or similar, name.  Attribution requires only a "reasonable match," rather than an exact match.  Defendant looks for middle names or initials, but a match can be made without one.  For example, consider the following two individuals, both of whom are Florida residents born on the same day with an uncommon name:

---

[1]  Prior to February 28, 2013, the background checks were prepared by LexisNexis Screening Solutions, Inc.  On that date, Defendant acquired LexisNexis and absorbed all of its liabilities. We refer to both entities as "Defendant."

Daniel Atreus Kowalski and Dan Kowalski.  Daniel and Dan have a match of two identifiers—identical dates of birth and "reasonably matching" names.  If Dan had a grand theft auto conviction, while Daniel had no criminal record, a background report compiled by Defendant on Daniel could nonetheless indicate that he had a grand theft auto conviction.  The fact that Daniel has a reported middle name would not prevent Dan's criminal record from being included in a background report on Daniel.  On the other hand, if Dan had a conflicting middle name or middle initial (*e.g.*, "C." or "Christopher"), Dan's conviction would not be included in Defendant's background report on Daniel.

Defendant purports to follow a different procedure when a customer requests a background report on an individual with a common name, such as Joe Smith.  In such a case, Defendant's policy provides that a member of the records adjudication team must attempt to locate a third identifier to ensure a reasonably accurate match.  An adjudicator could potentially use Experian to obtain an address history that might provide more information except for the fact that Defendant's agreement with Experian limits the number of employees who can conduct an Experian search; so Experian is not always utilized.  If the adjudicator cannot locate a third identifier, he or she must so note this fact and obtain a supervisor's permission before releasing the criminal background report.  Thus, notwithstanding Defendant's awareness that a third identifier should be obtained, its actual practice

permits matching a subject who has a common name with a criminal record based on only two identifier matches.

Defendant has a dispute system that allows consumers to contest items listed in their background reports.  Between 2010 and 2013, Defendant prepared 3,554,163 reports containing public record information.  During that time, Defendant made 13,392 corrections as a result of customers successfully disputing Defendant's inclusion of public records belonging to another individual in their background reports, yielding a "not-me" or "not mine" error rate of 0.38 percent nationally.[2]  During the relevant time period, Defendant's "not-me" or "not mine" error rate for Florida reports ranged from 0.28 percent (2013) to 0.64 percent (2012).

Pertinent here is the fact that Defendant's system offers no means to ensure that an investigative subject who has been mispaired with a particular criminal conviction or arrest of a person with a similar name will not be mismatched in future background checks with other convictions/arrests of this same person.  To return to our Dan/Daniel example above, assume that Dan was convicted in 2006 of grand theft auto, but a 2008 background report on Daniel erroneously attributed Dan's grand theft auto conviction to Daniel.  Seeing the error, Daniel immediately

---

[2] "Error rate" here is defined as the number of successful disputes divided by the total number of reports generated.

disputed the inclusion of the conviction in his background report, resulting in a revised report.  After being released from prison, Dan returns to his life of crime and is convicted of carjacking in 2013.  Although Defendant's system can prevent a future misattribution of the disputed 2006 conviction, it provides no means to prevent other convictions or arrests of Dan, such as the 2013 carjacking conviction, from being attributed to Daniel in a subsequent background report.

## II.    Events Leading to the Present Suit

Plaintiff Richard Williams has lived with his mother in Chiefland, Florida, for his entire life.  In February 2012, Plaintiff applied for a customer accounts representative position at Rent-A-Center East, Inc.'s ("Rent-A-Center") Chiefland store.  As part of the hiring process, Rent-A-Center asked Defendant to prepare a criminal background report on Plaintiff.

In preparing the Rent-A-Center background report, Defendant's employees examined public records from the Palm Beach County and Levy County courts. According to the Rent-A-Center report, Defendant used Plaintiff's first, middle, and last name, social security number, date of birth, and address to prepare the report.  The report also indicated that Defendant had obtained driver record information from Florida's motor vehicle records, and it listed Plaintiff's driver's license number and information.

On February 28, 2012, Defendant sent an electronic copy of the report to Rent-A-Center and mailed a copy to Plaintiff.  The report stated that the Palm Beach Circuit and County courts had two case numbers associated with a "Ricky Williams."  Both cases involved 2009 charges for sale of cocaine.  The listed disposition of the cases was "bench warrant."  Both cases stated that the "SSN on File" was the same as the first five digits of Plaintiff's social security number, though the report indicated that the match between Plaintiff and Ricky Williams was based on their names and dates of birth.  Given the criteria provided by Rent-A-Center, Plaintiff's "overall case score" was "ineligible."  Although Richard Williams is a common name, Defendant did not follow its common-name procedure, which called for the use of three, not just two, identifiers.

On March 1, 2012, Plaintiff filed a dispute with Defendant and provided a copy of his driver's license, which listed his height as five feet, ten inches.  After Plaintiff initiated the dispute, Defendant's employees ordered copies of the physical records relating to Ricky Williams' charges and saw that Ricky Williams' bench warrant listed his height as six feet, two inches.  Upon seeing the discrepancy in height, Defendant removed the sale-of-cocaine charges from Plaintiff's report.  On March 12, 2012, Defendant sent Rent-A-Center a revised background report clearing Plaintiff, but Rent-A-Center did not re-extend its job offer to Plaintiff.

Plaintiff subsequently applied for a variety of other jobs.  In November 2012, he was hired by the Levy County Sheriff's Office to be a 911 dispatcher. Rather than hiring an outside company, the Sheriff's Office conducted its own background check on Plaintiff and apparently found no disqualifying information. Unfortunately, though, Plaintiff could not meet performance expectations while in training, and he quit after about a month in lieu of being terminated.

In March 2013, Plaintiff was hired by Kangaroo, a gas station.  Like the Sheriff's Office, Kangaroo ran its own background check.  Plaintiff ultimately left the Kangaroo job because he was not working enough hours, and all of the money he made was used to pay for his own gas.  A few days after quitting his job at Kangaroo, Plaintiff received a call from Winn-Dixie Stores, Inc. ("Winn-Dixie"), offering him an interview.  Plaintiff subsequently received a job offer for a position at Winn-Dixie's Gainesville store, but the offer was contingent on Plaintiff passing a background check.  On April 23, 2013, Winn-Dixie asked Defendant to conduct a background check on Plaintiff.  Two days later, Defendant sent Winn-Dixie an electronic copy of the background report.  The report stated that a search for "Richard A. Williams" revealed two results from Broward County, Florida's records:  Ricky Williams' 2004 conviction for "burglary assault" and Ricky Williams' 2004 conviction for aggravated battery on a pregnant woman.  The match was again based on the similarity between Plaintiff's and Ricky Williams'

8

names and on their identical dates of birth, as well as the fact that Plaintiff lived in

Florida, where the crimes had occurred.[3]  The report listed Plaintiff's "overall case

score" as "ineligible."

Of course, like its first background report concerning Plaintiff issued just a

year before, this second report was also inaccurate in attributing Ricky Williams'

run-ins with the law to Plaintiff.  This is not surprising as the employees who

created this Winn-Dixie report lacked access to information regarding Plaintiff's

prior dispute, the contents of the Rent-A-Center report, or Plaintiff's driver's

license, even though Defendant had all of the above information.  Further, as with

the Rent-A-Center report, Defendant did not follow its common-name procedure—

that is, obtain a third identifier—in preparing the Winn-Dixie report.  Beyond

systemic failures, a note in Defendant's system indicated that one of its employees

had actually examined the Broward County Department of Corrections' website

while preparing the Winn-Dixie report.  That website not only indicated that Ricky

Williams was six feet, two inches tall but also revealed that he was currently

incarcerated in the Broward County Jail:  a fact that might reasonably have

prompted a question whether a Ricky Williams who was presently in jail 300 miles

---

[3]  Broward County, Florida is about 300 miles from Gainesville, Florida, which is near where
Plaintiff resided.

away was the same person as Richard A. Williams—the subject of the background report—who was seeking employment.

On May 2, 2013, Plaintiff contacted Defendant to again begin a dispute process. In resolving the dispute, Defendant obtained physical copies of Ricky Williams' court records, which happened to contain his social security number, and realized that the social security number found in the records did not match Plaintiff's. Defendant could have obtained physical copies of these records before the report was issued, but had failed to do so. On May 28, 2013, Defendant issued a revised background report that omitted the burglary and aggravated battery convictions, but by this time Winn-Dixie had already hired someone else to fill the position. Nonetheless, Plaintiff was hired by Winn-Dixie approximately six months later, in November 2013.

### III.    Procedural History

In November 2013, Plaintiff filed suit against Defendant, alleging violations of the FCRA.[4] In Count I of his second amended complaint, Plaintiff asserted that Defendant negligently or willfully violated 15 U.S.C. § 1681e(b),[5] which requires consumer reporting agencies to "follow reasonable procedures to assure maximum

---

[4] Plaintiff also asserted claims against Rent-A-Center and Winn-Dixie, but later voluntarily dismissed these claims.

[5] Plaintiff alleged three other claims for violations of the FCRA, which are not at issue on appeal.

possible accuracy" when preparing a consumer report.  15 U.S.C. § 1681e(b).

Plaintiff alleged that he suffered damages resulting from loss of employment,

reputational harm, and pain and suffering.  He requested compensatory and

punitive damages based on Defendant's violation of § 1681e(b).  Plaintiff

proceeded to trial.

> In addition to explaining the economic impact caused by the loss of these
two job opportunities, Plaintiff testified at trial as to the emotional impact that
being falsely tagged as a criminal had caused him.  He testified that the demeanor
of a Rent-A-Center employee with whom he interacted "changed" once the
background report was issued.  The employee told Plaintiff that Defendant's
"system is accurate and they can find anything and everything about you down to
your juvenile records."  When Plaintiff received the Winn-Dixie report and saw the
error, he felt "horrible" and "really, highly upset."  He began taking an
over-the-counter medication because he was experiencing headaches and insomnia.
Plaintiff's mother testified that Plaintiff was "bothered" and did not "eat[ ] like he
should have" after Rent-A-Center and Winn-Dixie declined to hire him.  She
confirmed that not getting the jobs caused Plaintiff to experience insomnia.

> Matthew O'Connor, Defendant's Vice President of Operations, conceded
that Defendant had within its records the following information before it issued to
Winn-Dixie its second report concerning Plaintiff:  (1) an individual named Ricky

Williams, who had been arrested for sale of cocaine, was a different person than

Plaintiff; (2) Ricky Williams was four inches taller than Plaintiff; and (3) Plaintiff

lived in Chiefland, not Palm Beach, which was 300 miles away and where Ricky

Williams had committed several crimes.  He agreed that had Defendant made

available the information from Plaintiff's dispute regarding the Rent-A-Center

report to the person preparing the Winn-Dixie report, this person would "know

with . . . certainty or virtual certainty" that Ricky Williams and Plaintiff were not

the same person.  Notably, O'Connor admitted that notwithstanding Defendant's

ostensible protocol requiring a third identifier for a subject with a common name,

in practice the finding of a third identifier is "kind of aspirational."

Plaintiff called Evan Hendricks as an expert witness.  Hendricks testified

that "other consumer reporting agencies" have procedures that allow them to use

information obtained in a prior successful dispute when preparing a subsequent

consumer report.  He explained:

> Equifax has a procedure called cross-blocking which means they know
> that the problem is the identifiers are dragging in the wrong information
> about consumer B and consumer A.  So they cross-block or flag those
> identifiers to make sure that anything—any information that's with that
> other wrongful identifier, that's not the subject of our consumer today,
> is blocked from him or his information from coming in.
>
> And then in Experian they call that the do not combine, where they have
> the same procedure in place where they make sure they mark or block
> or flag these identifiers from causing this wrongful mix.  These have
> been standard operating procedures for more than a decade with those
> two consumer reporting agencies that I have direct knowledge of.

Based on everything Hendricks had observed and reviewed, Defendant had no similar procedure, though he acknowledged that he did not know of any other background screening company that used the same procedures as Equifax or Experian.  Hendricks opined that, by choosing to use only two identifiers when preparing a report on an individual with a common name, Defendant was "basically inviting inaccuracy."  Hendricks admitted, however, that "there is no hard and fast rule" as to how many identifiers must match in order to pair a consumer with a criminal record.

After Plaintiff rested, Defendant moved for judgment as a matter of law on Count I and on Plaintiff's claim for compensatory damages resulting from the alleged harm to his reputation.  The district court denied Defendant's motion to the extent it sought judgment as a matter of law on Plaintiff's claim that Defendant negligently violated § 1681e(b), but took the motion under advisement to the extent Defendant sought judgment as a matter of law on Plaintiff's claim that Defendant willfully violated that section.  The district court denied judgment as a matter of law regarding the claim for compensatory damages resulting from the alleged harm to Plaintiff's reputation.

During Defendant's case-in-chief, it called Oscar Marquis as an expert witness.  Marquis explained that public records used in preparing criminal background reports typically contain only the individual's name and date of birth,

and not a social security number.  By contrast, credit agencies such as Experian and Equifax have access to credit account information, including the individual's name, address, social security number, date of birth, and account number.  Marquis was not aware of any criminal background screening company that requires a match of more than two identifiers to pair a consumer with a criminal record.

During closing arguments, Plaintiff contended that he suffered lost wages of $78,272.  The district court instructed the jury that, in considering damages, it should take into account any lost wages, emotional harm, or damage to Plaintiff's reputation.  The jury found that Defendant willfully failed to follow reasonable procedures to ensure maximum accuracy, as required by § 1681e(b).  It awarded Plaintiff $250,000 in compensatory damages and $3.3 million in punitive damages.  The district court entered judgment in favor of Plaintiff.

Defendant subsequently filed a motion for judgment as a matter of law, or, in the alternative, a motion for a new trial and/or remittitur.  The district court denied Defendant's motion.  This appeal followed.

## DISCUSSION

## I.   Standard of Review

We review the denial of a renewed motion for judgment as a matter of law *de novo*, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party.  *Proctor v. Fluor Enters., Inc.*, 494 F.3d

1337, 1347 n.5 (11th Cir. 2007).  "Judgment as a matter of law is appropriate when

a plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to

find for him on a material element of his cause of action."  *Id.* (quotation marks

omitted).  If there is a substantial conflict in the evidence, such that reasonable and

fair-minded persons exercising impartial judgment might reach different

conclusions, the district court must deny the motion.  *Id.*

We review the constitutionality of a punitive damage award *de novo*, but we

defer to the district court's factual findings unless they are clearly erroneous.

*Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1309 (11th Cir. 2007).

"A finding is clearly erroneous when although there is evidence to support it, the

reviewing court on the entire evidence is left with a definite and firm conviction

that a mistake has been committed."  *Robinson v. Tyson Foods, Inc.*, 595 F.3d

1269, 1275 (11th Cir. 2010) (quotation marks omitted).

## II.   Reputational Harm

Plaintiff asked for compensatory damages based on the emotional distress,

lost wages, and reputational harm caused by Defendant's conduct.  The jury

returned a general verdict awarding $250,000 in compensatory damages; that is, it

did not apportion its calculation based on the three types of harm alleged by

Plaintiff.  On appeal, Defendant argues that Plaintiff failed to present evidence

sufficient to prove damage to his reputation.

Although Plaintiff's evidence of reputational harm was not earth-shattering,

we conclude that a reasonable jury could find that he suffered harm to his

reputation.  At trial, Plaintiff testified that a Rent-A-Center employee's "demeanor

changed" after issuance of the background report showing that he had been

charged with selling cocaine.  The employee insisted to Plaintiff that Defendant's

"system is accurate and they can find anything and everything about you down to

your juvenile records."  Moreover, Rent-A-Center declined to re-extend a job offer

to Plaintiff even after the correction of his report.  We conclude that this is

sufficient for a jury to conclude that Plaintiff suffered some reputational harm.[6]

We therefore affirm the district court's denial of Defendant's motion for judgment

as a matter of law with respect to reputational harm.

## III.   Willfulness

Section 1681e(b) provides that "[w]henever a consumer reporting agency

prepares a consumer report it shall follow reasonable procedures to assure

maximum possible accuracy of the information concerning the individual about

whom the report relates."  15 U.S.C. § 1681e(b).  The FCRA does not make

---

[6] Defendant does not challenge the sufficiency of the evidence supporting Plaintiff's claims for
economic and emotional distress damages.

consumer reporting agencies strictly liable for all inaccuracies, but instead creates a private right of action for negligent or willful violations of the FCRA. *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991); *see* 15 U.S.C. §§ 1681n(a), 1681o(a). In this case, the jury found that Defendant had willfully violated the statute. This willfulness finding is significant because willfulness is a prerequisite to consideration of punitive damages, and here the jury also awarded substantial punitive damages.

To establish a willful failure to comply with § 1681e(b), a plaintiff must show that the consumer reporting agency either knowingly or recklessly violated the statute. *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017). "Recklessness" generally requires "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007) (quotation marks omitted). Thus, a consumer reporting agency acts in reckless disregard of FCRA requirements if its "action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

We conclude that a reasonable jury could conclude that Defendant acted willfully. Defendant itself had recognized the need to require more than two identifiers when dealing with a subject who has a common name. For that reason,

and to ensure "maximum possible accuracy," its protocol required three identifiers, absent supervisor approval when that was not possible.  Yet, the evidence suggested that this protocol may have been honored more in the breach than in actual practice.  Specifically, Defendant's Vice President of Operations agreed that obtaining a third identifier for an individual with a common name was "kind of aspirational":  an admission supporting an inference that, in its actual practices, Defendant consciously disregarded a known risk of violating the FCRA.  Certainly, as pertinent to Plaintiff's claim, Defendant failed to follow its own procedure twice:  first, when preparing a background report on Plaintiff for Rent-A-Center and, just a year later, when it was asked to prepare a second report concerning Plaintiff for Winn-Dixie.  *Cf. Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1307 (11th Cir. 2016) (concluding that a reasonable jury could find the defendant "either knowingly or recklessly reported debts as 'verified,'" in violation of 15 U.S.C. § 1681s-2(b), in part because the evidence suggested that the defendant knew it might need certain documentation to verify disputed debts, but failed to obtain such documentation).

Likewise, willfulness by Defendant was shown as to the additional error infecting the second report generated for Plaintiff.  This is so because Defendant failed to promulgate an adequate procedure to flag the existence of an inaccurate first report for purposes of future reports concerning that same subject.  While

Defendant apparently had the technological capability to bar future attribution to Plaintiff of the two criminal charges wrongly attributed to him in the first Rent-A-Center report—the two 2009 charges against Ricky Williams for cocaine dealing—and it did not include those charges in the second report, it failed to develop a means to prevent additional criminal arrests or convictions belonging to Ricky Williams from being attributed to Plaintiff.  And of course, that is exactly what happened here.  In preparing the second Winn-Dixie report, employees found an additional 2004 burglary-assault conviction and a 2004 aggravated battery conviction for the same Ricky Williams who was misidentified as Plaintiff in the first report.  Yet, because Defendant had established no procedure to block attribution to Plaintiff of other criminal charges concerning Ricky Williams or, at the least, to caution the preparer of subsequent reports that Plaintiff had been the victim of a previous mismatch between himself and a criminal with the same birthdate and a similar name, these 2004 convictions were wrongly included in the subsequent background report drafted for Winn-Dixie.

In short, sufficient evidence supported the jury's willfulness finding, and the district court properly denied the motion for judgment as a matter of law.

## IV.  Punitive Damages

As noted, the jury awarded Plaintiff compensatory damages in the amount of $250,000.  Having found that Defendant acted willfully, the jury was then

empowered to consider whether punitive damages should be awarded.  Concluding

that punishment was warranted, the jury awarded Plaintiff punitive damages in the

amount of 3.3 million dollars.  Defendant contends that no punitive damages were

appropriate, but that even if some punishment was supportable, 3.3 million dollars

is an amount so excessive that it violates the Due Process Clause of the

Constitution, and these damages should therefore be reduced.  We conclude that

punitive damages were properly awarded, but also conclude that, pursuant to the

standards set out by the Supreme Court, a 3.3 million dollar award was

unconstitutionally excessive.

     A.    <u>Constitutional Principles</u>

While compensatory and punitive damages are typically awarded at the

same proceeding by the same decisionmaker, they serve different purposes.  *State

Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  Compensatory

damages are intended to remedy a concrete loss suffered by the plaintiff due to the

defendant's wrongful conduct and to make that plaintiff whole.  Punitive damages,

on the other hand, "are aimed at deterrence and retribution":  to deter the defendant

and others from this type of conduct and to punish the defendant for his particular

wrongful conduct.  *Id.*  The discretion to impose punitive damages is not unbridled,

however.  Rather, "there are procedural and substantive constitutional limitations

on these awards."  *Id*.  And in the last three decades, the Supreme Court has

developed standards to be used in assessing whether a particular punitive damages award has exceeded constitutional limitations.

In *Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1 (1991), the Supreme Court considered whether a punitive damages award that was just slightly more than four times the amount of compensatory damages and "much in excess of the fine that could be imposed for insurance fraud" under state law[7] violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 23. While the Supreme Court concluded that "the monetary comparisons . . . may be close to the line," it determined that the award did not "cross the line into the area of constitutional impropriety." *Id.* at 23–24.

Two years later, in a fractured opinion, the Supreme Court addressed again a constitutional challenge to punitive damages. In *TXO Production Corp. v. Alliance Resources Corporation*, 509 U.S. 443 (1993), the plaintiff filed a common-law action for slander of title and received $19,000 in actual damages and $10 million in punitive damages. *Id.* at 446. Over a due process challenge, a plurality of the Supreme Court affirmed the punitive damages award, which was 526 times greater than the compensatory damages. *See id.* at 446, 453, 466; *id.* at 469 (Kennedy, J.,

---

[7] The jury returned a general verdict of $1,040,000 for one of the plaintiffs. *Haslip*, 499 U.S. at 6–7 n.1. The Supreme Court stated that, because the plaintiff asked for $200,000 in compensatory damages ($4,000 of which was for out-of-pocket expenditures), the punitive damages were likely no less than $840,000. *Id.* at 6–7 n.2. Thus, the punitive damages were likely 4.2 times the compensatory damages.

concurring in part and concurring in the judgment).  Three of the justices found it

"appropriate to consider the magnitude of the *potential harm* that the defendant's

conduct would have caused to its intended victim if the wrongful plan had

succeeded, as well as the possible harm to other victims that might have resulted if

similar future behavior were not deterred."  *Id.* at 460 (emphasis in original).

Moreover, "the dramatic disparity between the actual damages and the punitive

award" was not controlling in this particular case given that the jury could have

reasonably determined that the defendant corporation "set out on a malicious and

fraudulent course" to reduce royalty payments that were owed to the plaintiffs.  *Id.*

at 462.  Given the "amount of money potentially at stake, the bad faith of

petitioner, the fact that the scheme employed in this case was part of a larger

pattern of fraud, trickery and deceit, and petitioner's wealth," this plurality

determined that the award was not so "grossly excessive" as to violate due process.

*Id*.  Justice Kennedy concurred, noting his own concerns that the jury award may

have been based on "the jury's raw, redistributionist impulses stemming from

antipathy to a wealthy, out-of-state, corporate defendant," but nonetheless agreed

that affirmance could be justified based on the jury's likely finding that the

corporate defendant had acted with malice.  *Id.* at 468–69 ("This was not a case of

negligence, strict liability, or *respondeat superior*," but instead the defendant acted

"through a pattern and practice of fraud, trickery and deceit . . . . to defraud and

coerce those in positions of unequal bargaining power." (quotation marks

omitted)).[8]

In 1996, the Supreme Court overturned a punitive damages award on due

process grounds in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).  In

*Gore*, the plaintiff had purchased a BMW from a BMW dealership for

approximately $41,000.  *Id.* at 563.  Unbeknownst to the plaintiff, the car had been

repainted before it was purchased, which allegedly lowered its value by about 10

percent.  *See id.* at 563–64.  The plaintiff sued the defendant—the American

distributor of BMWs—and received $4,000 in compensatory damages and $4

million in punitive damages, which the Alabama Supreme Court remitted to $2

million.[9]  *Id.* at 565, 567.

In assessing whether this $2 million punitive damages award violated the

Constitution, the Supreme Court concluded that only awards that are "grossly

excessive" in relation to the relevant state interest violate the Due Process Clause

of the Fourteenth Amendment.  *Id.* at 568.  The Court noted that "[e]lementary

---

[8]  Three justices dissented and would have reversed the punitive damages award as being violative of the defendant's substantive due process right.  *Id.* at 472–501.

[9]  The Alabama Supreme Court remitted the punitive damages award based on its finding that the jury had considered an impermissible factor in calculating the award.  *Gore*, 517 U.S. at 567.  It did not indicate whether the $2 million figure represented the court's independent assessment of the appropriate amount of punitive damages or its determination of the maximum amount of an award that would comply with due process.  *Id.* at 567 n.10.

notions of fairness" require that a defendant receive fair notice of the severity of the punishment a state may impose for misconduct. *Id.* at 574. It set forth three "guideposts" relevant to the inquiry of whether a defendant had the requisite notice: (1) the degree of reprehensibility of the defendant's conduct; (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award"; and (3) the difference between the punitive damages award and any civil penalties authorized or imposed in comparable cases. *Id.* at 574–75.

In discussing the second guidepost, the Supreme Court considered the "long pedigree" of the principle that punitive damages should have a reasonable relationship to compensatory damages, and stated that approximately 65 enactments in English law between 1275 and 1753 provided for double, treble, or quadruple damages. *Id.* at 580–81. Reciting its earlier observations, it noted its conclusion in *Haslip* that a ratio of more than 4:1 between punitive and compensatory damages might be "close to the line" of constitutional impropriety. *Id.* at 581. As to its 1993 *TXO* decision, the Court indicated that "the relevant ratio" in *TXO* was no more than 10:1 because the *TXO* Court had relied on the difference between the punitive damages and the harm to the plaintiff that would have resulted had the defendant's tortious plan succeeded. *Id.* The *Gore* Court did not draw a bright line demarcating the limits of a constitutionally acceptable

punitive damages award, but it characterized the 500:1 ratio at issue as "breathtaking" and stated that such an award "must surely raise a suspicious judicial eyebrow." *Id.* at 583 (quotation marks omitted).  It reversed the judgment and remanded the case for further proceedings. *Id.* at 586.

Seven years later, the Supreme Court again overturned a punitive damages award on due process grounds in *State Farm Mutual Auto Insurance Company v. Campbell*, 538 U.S. 408 (2003).[10]  In that case, the plaintiff had caused a fatal car accident. *Id.* at 412–13.  The defendant—the plaintiff's insurance company— decided to contest liability, declined offers to settle for the $50,000 policy limit, ignored the advice of one of its own investigators, and took the case to trial, which resulted in a judgment that was $135,849 over the policy limit. *Id.* at 413.  The defendant initially refused to cover the excess liability or post a bond to allow the plaintiff to appeal the judgment against him. *Id.*  The plaintiff sued the defendant, alleging claims for bad faith, fraud, and intentional infliction of emotional distress. *Id.* at 414.  The jury awarded the plaintiff $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million, respectively. *Id.* at 415.  On appeal, the Utah Supreme Court

---

[10]  Between *Gore* and *State Farm*, the Supreme Court decided *Cooper Industries, Inc. v. Leathermen Tool Group, Inc.*, 532 U.S. 424 (2001), another case involving punitive damages and due process.  We do not discuss *Cooper* because the issue in that case was not whether the punitive damages award was constitutional, but whether the Ninth Circuit had applied the correct standard of review in considering the constitutionality of the award. *Id.* at 426.

reinstated the $145 million award based on its application of the *Gore* guideposts. *Id.* at 415–16.

The Supreme Court reversed the judgment and remanded the case. *Id.* at 429. In considering the reprehensibility of the defendant's conduct—"[t]he most important indicium of the reasonableness of a punitive damages award"—the Court articulated the following five factors as relevant: (1) whether the harm caused was physical, rather than economic; (2) whether the defendant's conduct "evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether the target of the conduct was financially vulnerable; (4) whether "the conduct involved repeated actions or was an isolated incident"; and (5) whether the harm resulted from "intentional malice, trickery, or deceit, or mere accident." *Id.* at 419 (quotation marks omitted). The Court stated that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

Turning to the second *Gore* guidepost, the Supreme Court again declined to impose "a bright-line ratio" between punitive and compensatory damages that a punitive damages award cannot exceed. *Id.* at 425. It stated, however, that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* The

Supreme Court discussed the ratio at issue in *Haslip* (approximately 4:1) and the

Court's prior conclusion that the punitive damages in *Haslip* might be close to the

line of constitutional impropriety. *Id.* It noted that it had "cited that 4-to-1 ratio

again in *Gore*" and further referenced a "long legislative history" providing for

sanctions of double, treble, or quadruple damages. *Id.* While the Court did not

consider these ratios to be binding, it found them "instructive." *Id.* The Court

concluded that ratios greater than those it had upheld "may comport with due

process where a particularly egregious act has resulted in only a small amount of

economic damages." *Id.* (quotation marks omitted). On the other hand, "[w]hen

compensatory damages are substantial, then a lesser ratio, perhaps only equal to

compensatory damages, can reach the outermost limit of the due process

guarantee." *Id.*

     The take-away from the above Supreme Court cases is as follows. Whether

it is a civil or criminal proceeding, the Due Process Clause requires that a

defendant be put on fair notice of the severity of the punishment that might be

imposed on him for his misconduct. When the punitive damages award in a civil

proceeding is grossly excessive in relation to the relevant state interest underlying

prohibition of the particular conduct at issue, the civil defendant has not received

fair notice and the award is therefore unconstitutional. A reviewing court should

evaluate two "guideposts" that are relevant here[11] in considering whether fair

notice could be imputed to a civil defendant against whom putatively excessive

damages have been awarded.  First, and most importantly, is the degree of

reprehensibility of the defendant's conduct, which should be evaluated based on

five factors.  Specifically, conduct can be deemed reprehensible when (1) the harm

inflicted was physical, rather than economic; (2) the conduct reflected an

indifference to the health or safety of others; (3) the target of the conduct was

financially vulnerable; (4) the conduct involved repeated actions, as opposed to an

isolated incident; and (5) the harm resulted from intentional malice or deceit, as

opposed to being a mere accident.  The Court did not require that all five factors be

present to sustain a punitive damages award, but indicated that the absence of all

five would render such an award suspect.

The Supreme Court's second guidepost looks to the disparity between the

harm or potential harm suffered by the plaintiff and the punitive damages award.

Although it set out no rigid bright-line rule, the Supreme Court has indicated that a

ratio greater than 4:1 between punitive and compensatory damages will likely be

close to the line of constitutional impropriety.  Moreover, the Court has noted that

few awards exceeding a single-digit ratio, to a significant degree, will satisfy due

---

[11]  The Supreme Court's third guidepost focuses on a factor not relevant in this case:  the difference between the punitive damages award and any civil penalties authorized or imposed in comparable cases.

process.  Nevertheless, when a particularly egregious act has resulted in only a

small amount of compensatory damages, then a greater ratio may be sustainable.

Conversely, when the plaintiff has received a substantial compensatory damages

award, then a lesser ratio—perhaps just a 1:1 ratio (that is, total damages not

exceeding double the compensatory damages award)—will reach the outermost

limit of the due process guarantee.

With these principles in mind, we turn first to the question whether punitive

damages were even appropriate in this case and then to the more difficult question

whether the $3.3 million punitive damages award in this case exceeded

constitutional limits.  We conclude that the jury properly awarded punitive

damages but that the amount of the award violates due process.[12]

B.    Whether Defendant's Conduct Was Sufficiently Reprehensible to
      Warrant an Award of Any Punitive Damages

In addressing Defendant's argument that no punitive damages should have

been awarded, we note that reprehensible conduct alone can justify a punitive

damages award.  *Action Marine*, 481 F.3d at 1322.  However, "punitive damages

should only be awarded if the defendant's culpability, after having paid

---

[12]  Although the Supreme Court in *Haslip*, *TXO*, *Gore*, and *State Farm* considered the limits
imposed by the Due Process Clause of the Fourteenth Amendment, we have applied this
principle in the context of a federal cause of action, implicitly invoking the Due Process Clause
of the Fifth Amendment.  *See, e.g.*, *Bogle v. McClure*, 332 F.3d 1347, 1350, 1362 (11th Cir.
2003) (concluding that a punitive damages award for racial discrimination in a 42 U.S.C. § 1983
suit did not violate due process).

compensatory damages, is so reprehensible as to warrant the imposition of further

sanctions to achieve punishment or deterrence."[13]  *State Farm*, 538 U.S. at 419.

Further, the district court's determination that the defendant's conduct is

reprehensible is ultimately factual and is therefore only reviewed for clear error.

*Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1334 (11th Cir. 1999).  "If a

district court's finding regarding the defendant's degree of reprehensibility is not

supported by the record or is contrary to the evidence, it is clearly erroneous."  *Id.*

at 1335 (quotation marks omitted).

In this case, the district court found that "four of the *State Farm*

reprehensibility [factors] weigh in Plaintiff's favor, and the fifth is neutral."  The

district court considered this to be "strong evidence" that Defendant's conduct was

reprehensible enough to support the $3.3 million punitive damages award.  As

noted, we agree that the reprehensibility of Defendant's conduct was sufficient to

warrant the award of some punitive damages.

      1.     The type of harm

The district court determined that the first *State Farm* reprehensibility

factor—which looks to whether the harm caused was physical, rather than

economic—weighed in favor of Plaintiff because he suffered emotional harm

---

[13]  Further, in identifying the guideposts that should be used in determining whether the amount of a particular punitive damages award exceeds constitutional limits, the degree of reprehensibility of the misconduct is likewise highly significant.

("feeling horrible") and physical harm (loss of appetite and insomnia), rather than purely economic damages. The district court's finding is not clearly erroneous.

Granted, there was no serious or life-threatening physical harm here as Plaintiff was never hospitalized nor in need of substantial medical treatment. Had this been the case, this factor would weigh even more heavily in the analysis. Nevertheless, the district court properly considered Plaintiff's emotional distress in weighing this factor. *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1288–89 (11th Cir. 2018) (finding a high degree of reprehensibility where the defendant's conduct caused physical and emotional harm, in addition to economic harm). Citing *Bogle v. McClure*, 332 F.3d 1347, 1359, 1362 (11th Cir. 2003) and *Goldsmith v. Bagby Elevator Company, Inc.*, 513 F.3d 1261, 1275, 1283 (11th Cir. 2008), *McGinnis* noted that we have at least twice upheld substantial punitive damages awards when the underlying compensatory damages award was based either entirely or substantially on the plaintiff's emotional distress. *McGinnis*, 901 F.3d at 1290.

And Plaintiff understandably suffered considerable emotional distress when he was twice wrongly identified as a criminal by Defendant and, as a result, lost two job opportunities. This emotional distress manifested itself in physical symptoms. Specifically, Plaintiff testified regarding his diminished appetite, insomnia, and headaches. Accordingly, this factor weighs in Plaintiff's favor.

31

2.    Indifference to or reckless disregard for health and safety

The district court found that the second factor—whether the defendant's conduct evinced an indifference to or a reckless disregard of the health or safety of others—also weighed in Plaintiff's favor.  According to the district court, Defendant's FCRA violations "put Plaintiff's livelihood at stake," and the jury could reasonably infer that losing the Rent-A-Center and Winn-Dixie job opportunities "affected [Plaintiff's] ability to pay for basic necessities like food, water, shelter, and clothing."  The district court also noted that Defendant's conduct "affected [Plaintiff's] mental health and ability to eat and sleep."

We conclude that the district court erred in characterizing this factor as having been met.  In the first place, we read this factor, which looks to whether the defendant's conduct showed a reckless disregard for the health or safety of others, as focusing on something larger than whether the reckless conduct might impact a particular person's ability to obtain a particular job.  At any rate, the court's analysis on this point was based on speculation, and not the record.  *See Johansen*, 170 F.3d at 1335.  Although not being hired for the Rent-A-Center and Winn-Dixie jobs undoubtedly had a temporary, negative financial impact on Plaintiff, there is no evidence that it actually impinged on his ability to pay for basic necessities.  And to the extent that one can typically expect the loss of a job opportunity to negatively impact a person's financial status, that factor is accounted for in the

third factor, discussed below.  Similarly, to the extent the loss of a job opportunity might impact one's health, that is accounted for in the first factor, discussed above.

In short, the mere fact that Plaintiff understandably suffered emotional distress from twice being wrongfully labeled a criminal falls well short of proof that Defendant's conduct revealed an indifference to or reckless disregard for health and safety.  While courts "may consider the risk of harm to others as part of the reprehensibility analysis," *Action Marine*, 481 F.3d at 1320, there is no evidence indicating that the issuance of an erroneous background report, as a general matter, presents a risk to the health or safety of others, or that the specific errors Defendant made in Plaintiff's case presented a substantial risk of injury to him.[14]  Thus, the district court erred in determining that the second *State Farm* factor weighs in favor of Plaintiff.

### 3.    Financial vulnerability

The district court found that the third *State Farm* factor—whether the target of the misconduct was financially vulnerable—also weighed in Plaintiff's favor. The court noted that Plaintiff "had little-to-no income when he applied for the Rent-A-Center and Winn-Dixie positions," and that Plaintiff "worked part-time at

---

[14]  *McGinnis* found that this second factor—"indifference to or reckless disregard of the health or safety of others"—was met in its case because the defendant there was well aware of the emotional damage and stress it was wreaking on Ms. McGinnis, but it reacted with only "indifference, obstinacy, and, at times, belligerence." *McGinnis*, 901 F.3d at 1288–89.  Here, however, Defendant promptly corrected each of the two reports in question once Plaintiff notified Defendant of its error.

two funeral homes . . . to make ends meet." The court found that this case was particularly compelling because Plaintiff "was of such limited means that he still lived at home with his mother."

Defendant argues that the district court's findings concerning this factor were speculative. It is true that Plaintiff offered no evidence setting out the precise status of his financial position when he applied for the Rent-A-Center position. The only evidence Plaintiff presented as to this issue was his own testimony that he "was doing . . . graphic designing in between [job interviews] trying to make money." He did not state how much money he was making when he applied for the Rent-A-Center or Winn-Dixie jobs. Moreover, although the district court assumed that Plaintiff had lived with his mother because of his "limited means," Plaintiff never offered an explanation for his living arrangements.

That said, it seems obvious from the evidence that Plaintiff was hardly swimming in money. When the Rent-A-Center job offer was withdrawn, Plaintiff sought and obtained other employment. When he lost that job, he obtained a job at a gas station and had to quit that job because the cost of his own gas to get to work ate up much of what he was making. Given Plaintiff's difficulty in maintaining consistent employment and the income levels of the jobs he sought, one can reasonably infer some financial vulnerability on his part. It is foreseeable that an individual relying on the types of jobs Plaintiff was seeking would be greatly

impacted by a background check that foreclosed employment in even these
positions.  And it is this factor on which the district court's observations are most
apt concerning the potential impact of Defendant's error on Plaintiff's inability to
pay for basic necessities.  We therefore conclude that this third factor favors the
imposition of punitive damages.

### 4. Repeated actions or isolated incidents

"[E]vidence that a defendant has repeatedly engaged in prohibited conduct
while knowing or suspecting that it was unlawful" weighs in a plaintiff's favor.
*Gore*, 517 U.S. at 576–77.  The district court found that this fourth *State Farm*
factor also weighed in Plaintiff's favor.  We agree.  First, as to Plaintiff, this was
hardly an isolated incident.  After Defendant mistakenly attributed another
person's criminal record to Plaintiff during the background investigation for the
Rent-A-Center job, just a year later it repeated this error when conducting the
Winn-Dixie investigation, again attributing a criminal conviction of this same felon
to Plaintiff.

As to Defendant's assertion that, in the larger scheme of things, this was an
anomalous case, both parties cite the same statistics to support their positions.
Defendant notes that the error rate for incorrectly attributing information of all
types—not just the type of information at issue here—from someone other than the
subject of the investigation was quite low.  Specifically, for the three-year period

of time between 2010 and 2013, and based on the number of successful challenges brought by individuals who disputed inclusion of public records belonging to another individual, Defendant's error rate nationally was just 0.38 percent and its error rate in Florida ranged from 0.28 percent in 2013 to 0.64 percent in 2012. Plaintiff takes this same evidence and notes that given the large number of investigative reports generated by Defendant (3.5 million during this time period), even an admittedly low error rate resulted in the issuance of over 13,000 background reports that incorrectly attributed information from another person's public records to the subject of the investigation.

It is true that Plaintiff never introduced evidence breaking down how many of these 13,000+ errors arose when Defendant had failed to use three identifiers in a common-name situation. This failure of specific proof constitutes a lapse by Plaintiff that will come back to haunt him when we explore the question whether the extremely high amount of punitive damages awarded by the jury here can be sustained. Nevertheless, as we understand the record, Defendant is neither arguing that Plaintiff's case represents an isolated occurrence nor denying that this type of error occurred from time to time when Defendant failed to use three identifiers for a subject with a common name. Thus, for purposes of determining whether any punitive damages could properly be awarded by the jury, we conclude that Plaintiff

has satisfied this fourth factor, which looks to whether the Defendant engaged in repeated reckless conduct.

> 5.     Intentional malice, trickery, or deceit, as opposed to a "mere accident"

The district court found that the fifth *State Farm* factor was "at best, neutral" because even if Defendant did not act out of intentional malice, trickery, or deceit, "its actions weren't a 'mere accident.'"  It is true that the jury found that Defendant had acted willfully, and willful conduct connotes something more than a simple accident; that is, willfulness requires, at a minimum, a showing of recklessness. Yet, there was no evidence of intentional malice, trickery, or deceit by Defendant, and it seems that this factor is looking at intentional misconduct—or something close thereto—which is clearly absent in this case.  At worst, Defendant acted recklessly, but without any intent to harm Plaintiff.  And as to both reports regarding Plaintiff, Defendant promptly corrected its error once advised that it had made a mistake.  Accordingly, we conclude that this factor weighs in Defendant's favor.

In sum, three of the five *State Farm* reprehensibility factors weigh in Plaintiff's favor and two factors weigh in Defendant's favor.  Thus, in scoring reprehensibility, Defendant's conduct was sufficiently reprehensible to warrant some amount of punitive damages, albeit that conduct was clearly not at the highest level of reprehensibility.  The question then become whether the punitive

damages awarded here were so excessive as to be deemed unconstitutional, thereby

warranting a reduction by this Court.  Given the high level of generality in the

standards used to determine this question, the answer is almost always an uncertain

one.  And so it is here.

      C.      <u>Whether the Punitive Damages Awarded Were So Excessive As to
Violate Defendant's Due Process Rights</u>

            1.     Ratio of punitive damages to actual damages

The Supreme Court has noted that the most important factor in reviewing a

punitive damages award is the reprehensibility of the defendant's conduct, and the

Court has set out five factors for evaluating reprehensibility.  But because it is

difficult to quantify a particular degree of reprehensibility—and still harder to

attach a monetary figure to even a rough quantification—the Court has indicated

that reviewing courts should also look to the ratio between the compensatory

damages award and the punitive damages award in evaluating whether a particular

punitive damages award is so excessive as to be deemed unconstitutional.  If the

disparity between a compensatory damages award and the punitive damages award

is too great, the punitive award may be deemed unconstitutional.

But how does one determine when the disparity is so great that a

constitutional violation has occurred?  The answer:  Not easily.  As explained

above, the shorthand guidance extrapolated from the Supreme Court's decisions is

as follows.  The Court has indicated that a ratio greater than 4:1 between punitive

and compensatory damages will likely be close to the line of constitutional impropriety. Moreover, few awards exceeding a single-digit ratio (that is, anything greater than a 9:1 ratio) to a significant degree will satisfy due process. But the Court has emphasized that these are not hard and fast rules. Sometime even a 4:1 ratio may be too great. If, for example, the plaintiff has received a substantial compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee and a punitive damages award that exceeds that ratio will be suspect. On the other hand, if a particularly egregious act has resulted in only a small amount of compensatory damages, then a greater ratio can be justified. Accordingly, we will operate under the assumption that a 4:1 ratio is the Court's suggested default guideline, but that this ratio may be adjusted depending on the above factors.

The ratio in this case of punitive damages to compensatory damages is a little over 13:1. For sure, this is not as "breathtaking" as was the 500:1 ratio in *Gore*, but it is also well outside the 4:1 range deemed "close to the line" of constitutional impropriety in *Haslip*. Further, it exceeds a single-digit ratio between punitive and compensatory damages, which according to the Supreme Court in *State Farm* raises a red flag that the punitive damage amount likely violates the due process clause. *See State Farm*, 538 U.S. at 425 ("[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory

damages, to a significant degree, will satisfy due process.").  Finally, while a

higher ratio may be acceptable if the compensatory damages award is low, here the

compensatory damages award of $250,000 was clearly not a small amount of

money, particularly given that Plaintiff contended that his lost wages were only in

the $75,000 range.  As set out above, higher ratios between compensatory damages

and punitive damages are more reasonably justified when the former is for a

relatively small amount of money.

For these reasons, we begin our analysis with antennae raised, as we

consider whether the default 4:1 ratio, or something close thereto, should constitute

the uppermost range in this case, for due process purposes.  Before setting out our

analysis in this case, we start with a review of cases from this Circuit, followed by

a review of cases from other circuit courts.

2.  Examination of punitive damages cases from this Circuit

We have previously evaluated punitive damages awards with similar ratios

in only two cases:  *EEOC v. W&O, Inc.*, 213 F.3d 600 (11th Cir. 2000) and

*Goldsmith v. Bagby Elevator Company, Inc.*, 513 F.3d 1261 (11th Cir. 2008).

Unfortunately, as the underlying conduct in those cases was more reprehensible

than that here, neither is terribly analogous to this case.  In *W&O*, three employees

sued their employer for pregnancy discrimination.  *W&O*, 213 F.3d at 607.  The

jury awarded the employees backpay in relatively modest amounts:  $3,800.24,

$6,225.46, and $26,231.43.[15]  *Id.* at 609.  After taking into account the statutory

cap, each employee also received $100,000 in punitive damages, yielding

approximate ratios of 26:1, 16:1, and 4:1, respectively.  *Id.* at 609, 616.  The

aggregate ratio of punitive damages to back pay was 8.3:1.  *Id.* at 616.  We

concluded that the punitive damages awards were reasonable.  *Id.* at 616–17.

  *W&O*, however, provides little guidance for this case.  First, although the

26:1 and 16:1 ratios were higher than the 13:1 ratio in this case, the compensatory

damages award in *W&O* was very small in comparison to the more substantial

$250,000 compensatory damages award in this case.  As explained above, a higher

ratio is supportable if the amount of compensatory damages is low.  *See Gore*, 517

U.S. at 582.  Additionally, the underlying action in *W&O* challenged a written

policy that expressly discriminated against pregnant women, and the evidence

showed that the owner had made several disparaging comments about pregnant

women.  *W&O*, 213 F.3d at 607–08.  The egregiousness of the repetitive,

intentional discrimination at issue in *W&O* is simply not present here.

  Similarly, in *Goldsmith*, the plaintiff alleged repeated racial discrimination at

his place of employment.  *Goldsmith*, 513 F.3d at 1274–75.  The jury awarded the

plaintiff $27,160.59 in back pay, $27,160.59 in damages for mental anguish, and

---

[15]  We concluded that we could consider an award of back pay when deciding whether a punitive damages award is disproportionate to the plaintiff's actual damages award.  *W&O*, 213 F.3d at 615.

$500,000 in punitive damages, yielding a ratio of approximately 9:1.  *Id.* at 1275.
We concluded that the punitive damages award did not violate due process.  *Id.* at
1285.

Like *W&O*, however, *Goldsmith* provides little guidance.  Again, the actual
damages in *Goldsmith* were much smaller than the compensatory damages in this
case:  in fact, one-fifth the size of the compensatory damages here.  Further, the
ratio of punitive damages to actual damages (9:1) did not exceed a single-digit
multiplier, as did the 13.1 ratio in this case.

But the most significant difference between *Goldsmith* and this case is the
substantially greater level of reprehensibility displayed in the facts of *Goldsmith*,
which involved repeated acts of intentional racial discrimination, harassment, and
retaliation.  *See id.* at 1267 (describing racism as "an evil to be remedied in our
Nation").  Specifically, the plaintiff's supervisor and another employee repeatedly
used racial slurs against plaintiff, and the company president had also uttered a
racial slur.  *Id.* at 1269, 1273–74.  When the plaintiff complained to the
defendant's vice president, the vice president said, "You are just going to have to
accept it."  *Id.* (quotation marks omitted).  Further, the plaintiff was fired after
filing an EEOC charge, as were other black employees who had been terminated
for reporting racial slurs or filing EEOC charges.  *Id.* at 1271–74.

As *Goldsmith* noted, "[t]he dominant consideration in the evaluation of a punitive damages award is the reprehensibility of the defendant's conduct." *Id.* at 1283. Justifying its affirmance of the punitives in the case before it, *Goldsmith* noted that our court has upheld punitive damages awards that substantially exceed compensatory damages when the misconduct was "exceedingly reprehensible." *Id.* at 1284. That characterization, the panel noted, applied to the case before it as the "flagrant disregard of Goldsmith's federal rights was exceedingly reprehensible, and there was evidence of a pattern of retaliatory and discriminatory misconduct" by the defendant. *Id.* The sort of intentional, malevolent behavior described in *Goldsmith*, however, is a far cry from Defendant's conduct in this case, which was, at worst, a willful disregard of the possibility that inaccurate information would find its way into a criminal background report.

Since *Gore*, our Court has examined whether punitive damages awards comply with due process in a few other cases, but they involve dissimilar ratios. In *Kemp v. American Telephone & Telegraph Co.*, 393 F.3d 1354 (11th Cir. 2004), the jury awarded the plaintiff $1 million in punitive damages, but only $115.05 in actual damages, after finding the defendant guilty of fraudulent billing practices and collecting illegal gambling debts, in violation of federal and state Racketeer Influenced and Corrupt Organizations ("RICO") statutes. *Id.* at 1357. Concluding that a million-dollar award was so excessive as to violate the defendant's due

process right, we vacated the punitive damages award and directed the trial court to reduce the punitive damages to $250,000.  *Id.* at 1365.

We explained our thinking.  Although defendant AT&T "deserved to pay a serious penalty for its misconduct," one that would "be large enough to deter []
misconduct," we concluded that "one million dollars, in relationship to the amount of harm that occurred in this case, is constitutionally excessive."  *Id*.  As to the award amount we settled on—$250,000—we acknowledged that the Supreme Court has said that few awards substantially exceeding a single-digit ratio between compensatory and punitive damages would satisfy due process and further acknowledged that a $250,000 punitive damages award, with a compensatory damages award of only a hundred dollars, greatly exceeded this single-digit ratio.  *Id.* at 1363, 1364.  Yet, given this small amount of compensatory damages, a punitive damages award that did not exceed a 9:1 ratio would have totaled only about $1,000, which we concluded "would not effectively punish [defendant] AT&T for its conduct or serve any deterrent value whatsoever."  *Id*. at 1365.  As to the $250,000 figure that we finally arrived at, we noted that although "there is no algorithm that yields a precise figure," we were "persuaded that an award that was less than $250,000 would not serve as a meaningful deterrent to a corporation like AT&T," but equally persuaded that an "award greater than this amount [] would prove an unconstitutional windfall."  *Id*.

For sure, the ratio in *Kemp* is a lot bigger than the 13.1 ratio here.  But it's understandable that the ratio would necessarily be a lot larger in that case as the almost nominal compensatory damages award of $115.05 there is dwarfed by the $250,000 in actual damages here.  Clearly, with such a small amount of actual damages in *Kemp*, a fairly large multiplier for the punitive damages was necessary to meaningfully punish and deter the defendant.  Additionally, like *W&O* and *Goldsmith*, the *Kemp* defendant's conduct was far more reprehensible than Defendant's conduct in this case.  In finding the defendant guilty under the federal and state RICO statutes, the jury necessarily determined that the defendant "intentionally participated in a scheme to defraud another of money or property." *See id.* at 1359.  Additionally, we concluded that the defendant played a "critical role" in the illegal gambling scheme, which "could never have succeeded" without it.  *Id.* at 1365.

By contrast, Defendant's conduct in this case was the willful failure to ensure that reports were accurately generated, which is more aggravated than a negligent failure would have been, but clearly less egregious than the intentional fraud at issue in *Kemp*.  Finally, even though the *Kemp* defendant engaged in significantly more reprehensible conduct than Defendant did, we nonetheless vacated the punitive damages award of a million dollars, and further concluded that, any amount greater than $250,000 "would prove an unconstitutional

45

windfall." *Id.* The punitive damages award in this case—$3.3 million—was more than thirteen times higher than the $250,000 that we said constituted the outside limit of a constitutional award in the *Kemp* RICO fraud case:  a case that involved intentional conduct that was more reprehensible.

In *Johansen v. Combustion Engineering, Inc*. 170 F.3d 1320 (11th Cir. 1999), acidic water from waste areas on the defendant's former mining site periodically seeped into streams that flowed downstream through the plaintiffs' properties. *Id.* at 1326–27.  At trial, the jury awarded each plaintiff modest compensatory damages ranging between $1,000 and $10,000 each,[16] but awarded punitive damages in the whopping sum of $45 million for these fifteen property owners. *Id.* at 1327.  The district court found this to be a "shocking" amount that would "give the system a black eye," and it reduced the punitives to $15 million. *Id*.  After we affirmed the judgment without opinion, the defendant petitioned for certiorari, arguing that the punitive damages award was unconstitutionally excessive.  The Supreme Court vacated our judgment and remanded the case for further consideration in light of *Gore*. *Id*.  On remand, the district court

---

[16]  The modest compensatory damages can be explained by the fact that the plaintiffs suffered no personal injuries, risk to human health, diminution in property value, damage to crops or animals, or any other economic loss.  Instead the damage was aesthetic and environmental in that the streams looked and smelled bad, the streams no longer contained fish, and the cows would no longer drink from the streams. *Id.* at 1327.

determined that a punitive damages award of $4.35 million would not infringe

constitutional limits, and it awarded that amount. *Id*.

Neither side was happy. The plaintiffs appealed, arguing that the district

court erred in holding that the $15 million award given after the first trial was

unconstitutionally excessive. The defendant appealed, arguing that the $4.35

million announced by the district court, post-remand, was also unconstitutionally

excessive. *Id*. at 1327–28. On appeal, we rejected the plaintiffs' argument, and

concluded that a $15 million award would be "grossly excessive." As to the $4.35

million reduced amount, arrived at by the district court on remand, that figure

produced ratios high enough to "raise a suspicious judicial eyebrow." *Id*. at 1338

(quotation marks omitted). Nonetheless, we noted the Supreme Court's

admonition that a low award of compensatory damages will support a higher ratio

than will a high compensatory amount, and further that a higher ratio may also be

justified when the injury is hard to detect—such as the initially covert

environmental damage to the streams—or when it is difficult to value the non-

economic harm. *Id*. We found this to be such a case. The actual damages were

small and the State's interest in deterring environmental pollution was strong. *Id*.

Moreover, the defendant in *Johansen* was "a large and extremely wealthy international corporation."[17]  *Id.*

We determined that this situation was one in which a substantial disparity between actual damages and punitive damages would not be unconstitutionally excessive because the actual damages were "relatively small," and the state's interest in deterring environmental pollution was strong.  *Id.* at 1338.  Once again, our case is distinguishable from *Johansen*.  Here, the compensatory damages were not "relatively small."  *Id.*  Moreover, given the potential state civil fines for environmental pollution, the defendant in *Johansen* was on "fair notice [] that it might be subject to a substantial penalty for pollution of the streams running through its property."  *Id.* at 1339.

Our other cases evaluating, and approving, punitive damages awards all involved significantly lower ratios than the ratio at issue here.  Indeed, all four cases considered ratios that were within or close to the 4:1 ratio mentioned in *Haslip*, *Gore*, and *State Farm*.  *See McGinnis*, 901 F.3d at 1290 (5.9:1); *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1221 (11th Cir. 2010) (approximately 5:1);

---

[17]  The evidence in this case does not clearly reveal how wealthy Defendant is.  In closing argument, Plaintiff's counsel asked the jury to impose somewhere between (1) 10% of the company's cash on hand ($10.8 million), which would total $1,080,000, or (2) 1% of the value of the division of the company that was involved in conducting the background check (whose value counsel suggested could be determined by looking at its purchase price of $336 million), which would total $3.3 million.

*Action Marine*, 481 F.3d at 1321 (approximately 5.5:1); *Bogle*, 332 F.3d at 1362
(approximately 4:1).  Of these four cases, *McGinnis* had the most similar monetary
award ($3 million in punitive damages and $506,000 in compensatory damages),
but it involved a "high degree of reprehensibility" not present here.[18]  *McGinnis*,
901 F.3d at 1285, 1287–88.  Otherwise, none of the cases involved compensatory
or punitive damages awards comparable to the awards here.  Accordingly, these
cases do little to illuminate the proper disposition of this case.

> ### 3.    Examination of out-of-circuit punitive damages cases

Given the dearth of controlling precedent from this Court and the Supreme
Court, we look to see whether our sister circuits provide any persuasive authority.
Of the seventeen out-of-circuit cases in which the damages ratio was comparable
to the ratio in this case (between approximately 10:1 and 15:1), the punitive
damages award was affirmed in eight cases and vacated in nine.  *See EEOC v. Fed.
Express Corp.*, 513 F.3d 360, 377–78 (4th Cir. 2008) (12.5:1 ratio affirmed);

---

[18]  In *McGinnis*, the jury determined that the defendant mortgage company acted with the
specific intent to harm.  The defendant raised the monthly mortgage and escrow payments owed
by the plaintiff, yet would never explain the reason for the increase, notwithstanding the
plaintiff's repeated and increasingly frantic requests for an explanation.  And, indeed, the
defendant was not entitled to the increased payments it was demanding.  *McGinnis*, 901 F.3d at
1286–87, 1289.  "Undeterred, [the defendant] continued to demand payment of the unexplained
amount, collect unwarranted late fees, and proceed to foreclosure without ever justifying the
increase," insisting that the plaintiff "was required to pay any amount [the defendant]
demanded."  *Id*. at 1292.  We concluded that all five of the *Gore* reprehensibility guideposts had
been satisfied and that a punitive to compensatory damage ratio of 5.9:1 was not grossly
excessive.

*Alexander v. City of Milwaukee*, 474 F.3d 437, 454–55 (7th Cir. 2007) (affirming a range of ratios, the highest of which was approximately 11:1); *Casillas-Diaz v. Palau*, 463 F.3d 77, 86 (1st Cir. 2006) (affirming 10:1 ratio as to the first of two plaintiffs); *Bielicki v. Terminix Int'l Co.*, 225 F.3d 1159, 1165–66 (10th Cir. 2000) (12:1 ratio affirmed); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1230–31 (10th Cir. 2000) (9.65:1 ratio affirmed); *Parsons v. First Inv'rs Corp.*, 122 F.3d 525, 530–31 (8th Cir. 1997) (11:1 ratio affirmed); *Dean v. Olibas*, 129 F.3d 1001, 1007–08 (8th Cir. 1997) (14:1 ratio affirmed); *Davis v. Rennie*, 264 F.3d 86, 117 (1st Cir. 2001) (10:1 ratio affirmed); *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1069, 1073 (10th Cir. 2016) (11.5:1 ratio vacated); *Ondrisek v. Hoffman*, 698 F.3d 1020, 1029, 1031 (8th Cir. 2012) (10:1 ratio vacated); *S. Union Co. v. Irvin*, 563 F.3d 788, 791–92 (9th Cir. 2009) (10:1 ratio vacated); *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 488, 490 (6th Cir. 2007) (9.5:1 ratio vacated); *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827, 833–34 (8th Cir. 2004) (10:1 ratio vacated); *Clark v. Chrysler Corp.*, 436 F.3d 594, 606, 608 (6th Cir. 2006) (13:1 ratio vacated); *Lust v. Sealy, Inc.*, 383 F.3d 580, 589, 591 (7th Cir. 2004) (10:1 ratio vacated); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 793, 799 (8th Cir. 2004) (10:1 ratio vacated); *Watkins v. Lundell*, 169 F.3d 540, 546–47 (8th Cir. 1999) (15:1 ratio vacated).

Notably, the compensatory damages award in each of the affirmed cases with similar ratios was smaller—some of them significantly so—than the compensatory damages award here, rendering those cases somewhat distinguishable from this case.  The largest of these compensatory damages awards was $170,100, and each of the others was less than $100,000.  *Bielicki*, 225 F.3d at 1162 ($170,100, comprising awards of $60,700, $77,800, and $31,600 to each of three plaintiffs, which the Tenth Circuit considered in the aggregate); *Davis*, 264 F.3d at 116–17 ($100,000); *United Phosphorus*, 205 F.3d at 1224, 1231 ($67,694.03); *Casillas-Diaz*, 463 F.3d at 80 ($50,000 awarded to the first of two plaintiffs); *Alexander*, 474 F.3d at 442 (ranging from $9,500 to $50,000); *Parsons*, 122 F.3d at 527 ($26,949.51); *Fed. Express Corp.*, 513 F.3d at 363 ($8,000); *Dean*, 129 F.3d at 1007 ($5,000).

The cases with similar ratios in which our sister circuits vacated the punitive damages awards provide some support for Defendant's position that the punitive damages here were unconstitutionally excessive.  In all but one of the vacated cases, the compensatory damages were either comparable to or higher than the compensatory damages in this case.  *See Ondrisek*, 698 F.3d at 1024 ($3 million each for two plaintiffs); *Lompe*, 818 F.3d at 1068–69 ($1.95 million); *Williams*, 378 F.3d at 793 ($600,000); *Stogsdill*, 377 F.3d at 829 ($500,000); *S. Union Co.*, 563 F.3d at 792 ($395,072.38); *Bridgeport Music*, 507 F.3d at 475 ($366,939);

*Clark*, 436 F.3d at 606 ($235,629.13); *Watkins*, 169 F.3d at 543 ($235,000); *Lust*,
383 F.3d at 589 ($27,000).

In seven of the nine cases in which the punitive damages were deemed
excessive, the punitive damages award was remanded for remittitur to a ratio of 4:1
or less. *See Ondrisek*, 698 F.3d at 1030–31 (4:1); *Lompe*, 818 F.3d at 1075–76
(1:1); *Williams*, 378 F.3d at 799 (1:1); *Stogsdill*, 377 F.3d at 833–34 (4:1); *S.*
*Union Co.*, 563 F.3d at 792 (3:1); *Bridgeport Music*, 507 F.3d at 490 (no more than
approximately 1:1 or 2:1); *Clark*, 436 F.3d at 608 (2:1). In one case, the punitive
damages award was remanded for a remittitur of a ratio of less than 6:1. *Lust*, 383
F.3d at 589, 591 (5.6:1). And in the remaining case, the Eighth Circuit did not
specify the amount by which the punitive damages award should be remitted, but
commented that it was "not persuaded that the award should exceed a 4-to-1 ratio."
*Watkins*, 169 F.3d at 547.

We have also examined fifteen out-of-circuit cases involving compensatory
damages awards comparable to (within $50,000 of) the damages in this case. *See*
*In re C.R. Bard, Inc.*, 810 F.3d 913, 917 (4th Cir. 2016) ($250,000); *Thomas v.*
*iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2011) (approximately $280,700);
*Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 20 (1st Cir. 2010) ($213,000);
*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1020 (8th
Cir. 2008) ($250,000 total); *Clark*, 436 F.3d at 606 ($235,629.13); *Casillas-Diaz*,

463 F.3d at 80 ($250,000 awarded to the second of two plaintiffs); *Farfaras v.*

*Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 560 (7th Cir. 2006) ($200,000);

*Stamathis v. Flying J, Inc.*, 389 F.3d 429, 433 (4th Cir. 2004) ($250,000); *DiSorbo*

*v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) ($250,000); *Zimmerman v. Direct Fed.*

*Credit Union*, 262 F.3d 70, 72 (1st Cir. 2001) ($200,000); *Watkins*, 169 F.3d at 543

($235,000); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 906 (9th Cir. 1999)

($251,218); *Barnes v. Logan*, 122 F.3d 820, 821 (9th Cir. 1997) ($261,561);

*Mathie v. Fries*, 121 F.3d 808, 810 (2d Cir. 1997) ($250,000); *Cont'l Trend Res.,*

*Inc. v. OXY USA Inc.*, 101 F.3d 634, 635 (10th Cir. 1996) ($269,000).

The punitive damages awards were vacated in six of these cases, *Clark*, 436

F.3d at 608, *DiSorbo*, 343 F.3d at 189, *Watkins*, 169 F.3d at 547, *Mathie*, 121 F.3d

at 817, *Cont'l Trend Res.*, 101 F.3d at 643, *Mercado-Berrios*, 611 F.3d at 30, and

upheld in nine, *C.R. Bard*, 810 F.3d at 918, *Thomas*, 652 F.3d at 149–50, *Craig*

*Outdoor Advert.*, 528 F.3d at 1021, *Casillas-Diaz*, 463 F.3d at 86, *Farfaras*, 433

F.3d at 560, *Stamathis*, 389 F.3d at 433, *Zimmerman*, 262 F.3d at 72, *Pavon*, 192

F.3d at 910, *Barnes*, 122 F.3d at 825.  The majority of the affirmed cases involved

ratios of 2:1 or less.  *Casillas-Diaz*, 463 F.3d at 86 (2:1 as to the second of two

plaintiffs); *Zimmerman*, 262 F.3d at 82 (2:1); *Pavon*, 192 F.3d at 910 (1.2:1);

*Stamathis*, 389 F.3d at 443 (1.4:1); *Barnes*, 122 F.3d at 821, 824 (approximately

1:1); *Farfaras*, 433 F.3d at 560, 567 (0.5:1).  Only two of these cases had ratios

higher than 2:1, and both of them were lower than the ratio in this case. *Craig Outdoor Advert.*, 528 F.3d at 1020 (8:1); *C.R. Bard*, 810 F.3d at 931 (7:1). As to the cases in which the punitive damages award was vacated, two involved ratios close to the ratio in this case. *See Clark*, 436 F.3d at 605–06 (approximately 13:1); *Watkins*, 169 F.3d at 546 (approximately 15:1).

The last case, *Watkins* suggests that the punitive damages award in this case is unconstitutionally excessive. In *Watkins*, the plaintiffs sued the defendants for breach of contract and fraud regarding a sale of land. *Watkins*, 169 F.3d at 542. Although the defendants agreed to a settlement, they refused to make any payments in accordance with the settlement or comply with the agreement's other terms. *Id.* In addition, the property the defendants used as security for the agreement "turned out to be worthless." *Id.* The Eighth Circuit stated that it could fairly be inferred "based on previous conduct, conduct during the settlement, and subsequent conduct, that [one of the defendants] induced the settlement agreement knowing he would never pay any amount." *Id.* at 546. Moreover, the defendant gave worthless property as security, made false assurances, and repeatedly attempted to avoid and delay his obligations to the plaintiffs. *Id.* The district court found that the defendant "engaged in a pattern, practice or scheme characterized by fraud and deceit." *Id.* (quotation marks omitted). The Eighth Circuit agreed that

the defendant's conduct was reprehensible, but was "not persuaded that the award should exceed a 4-to-1 ratio." *Id.* at 546–47.

In this case, by contrast, Defendant did not intentionally engage in fraud or deceit.  At worst, it acted with reckless disregard for its obligations under the FCRA.  Yet, notwithstanding the greater reprehensibility of the *Watkins* defendant's conduct, the Eighth Circuit concluded that the punitive damages award should not exceed a 4:1 ratio.  *Id.*

D.   Determination of the constitutionality of the present award

Trying to extrapolate guiding principles from the caselaw is a migraine-inducing exercise, as the dissection of the above cases well reveals.  Instead of a firm, fixed mathematical formula for assessing whether a particular punitive damages award is so grossly excessive as to violate a defendant's due process rights, we instead have guidelines that are so flexible as to almost lose their status as an objective standard.  At bottom, the problem is not that that the particular guidelines for determining reprehensibility are not reasonable—they are quite sensible—but that the caselaw thus far has provided no consistent means of monetizing those guidelines.  For example, what is a low level of reprehensible conduct as compared to a high level, and how do we monetize those degrees of reprehensibility, and the resulting harm, to determine when a punitive damages award is grossly excessive, versus just slightly excessive?   In figuring out whether

55

the ratio between punitive and compensatory damages is too high, how do we gauge whether the compensatory damages award is for a "significant" amount of money (which calls for a lower ratio between the two types of damages) or—if we deem the compensatory damages to be insignificant—whether the underlying conduct was "egregious" enough to allow us to reject the 4:1 ratio-guideline suggested by the Supreme Court? *Cf. Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) ("It is not that [a high] ratio violates the Constitution. Rather, the mathematics alerts the courts to the need for special justification.").

In reversing a punitive damages award of $3 million and holding that those damages should not have exceeded a 1:1 ratio to a $582,000 compensatory damages award, the Seventh Circuit recently elaborated on the flexible and inexact approach that a reviewing court must take in evaluating a due process challenge to a punitive damages award:

> The disparity guidepost is not a mechanical rule. The court must calculate the ratio to frame its analysis, but the ratio itself does not decide whether the award is permissible. The answer might be yes, despite a high ratio, if the probability of detection is low, the harms are primarily dignitary, or if there is a risk that limiting recovery to barely more than compensatory damages would allow a defendant to act with impunity. It might be no, even with a low ratio, if the acts are not that reprehensible and the damage is easily or already accounted for. Rather than simply move numbers around on a verdict form to reach a single-digit ratio, courts should assess the purpose of punitive damages and the conduct at issue in order to evaluate the award.

*Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1089–90 (7th Cir. 2019) (citations omitted).

Stated less elegantly, it is ultimately up to the reviewing court to eyeball the punitive damages award and, after weighing the egregiousness of the particular misconduct and the harm it has caused, decide whether the award is grossly excessive. As a practical matter, the elasticity of the guidelines means that each court's decision will be very fact-specific and that it may yield few overarching principles that can be applied to future cases.

Yet, we cannot throw up our hands in frustration just because the exercise is so imprecise. In the first place, the Supreme Court has advised us that we must pursue this inquiry when a punitive damages award is challenged as being unconstitutional. As the Supreme Court has noted, a punitive damages award can be so out of whack that it screams a violation of due process, and we are obliged to make that assessment. And it is only through the development of caselaw that more defined principles can emerge. Plus, reviewing courts at least have some guidelines to follow. In contrast, juries are often left to pick a number out of the sky, tethered to nothing more than the jury's emotional reaction to the misdeed of a corporation with deep pockets.[19] With the above caveats, we embark on an

---

[19] The instructions to the jury here included no definition of reprehensibility or any mention of the factors that the Supreme Court has said should inform a decision as to whether the defendant's conduct was sufficiently reprehensible to warrant punitive damages.

analysis of the punitive damages award in this case.  We conclude that it is

unconstitutionally excessive.

    1.    Application of the above principles to this case

As noted, the Supreme Court in *Gore* set out two guideposts that are relevant

here in determining whether the defendant was on fair notice of the severity of

punishment that might be imposed for its misconduct:  (1) the degree of

reprehensibility of the defendant's conduct and (2) the disparity between the harm

suffered by the plaintiff and the punitive damages award.

The jury in this case awarded Plaintiff $250,000 in compensatory damages

and $3.3 million in punitive damages.  As to the degree of disparity between the

punitive damages award and the harm to Plaintiff, the above figures represent a

13.1 ratio between the punitive and compensatory damages.  The Supreme Court

has stated that a 4:1 ratio will typically be close to the line of constitutional

propriety and that few awards exceeding a single-digit ratio to a significant degree

will satisfy due process.  The 13:1 ratio here obviously violates those benchmarks.

While the Supreme Court has made clear that its suggested benchmarks do not

create a binding rule and that each case should be considered on its own facts, we

will assume this 4:1 ratio to be a default position for purposes of framing our

analysis.

We therefore turn back to an assessment of the reprehensibility of Defendant's conduct to determine whether a greater ratio is necessary in this case to achieve the goals of punitive damage:  punishment and deterrence.  Given the amount of compensatory damages awarded to Plaintiff, we conclude that Defendant's conduct was not reprehensible enough to justify a ratio higher than 4:1, meaning that the jury's verdict amount involving a much higher ratio was unconstitutionally excessive.

As noted, the jury reasonably found that Defendant willfully violated the FCRA by knowingly or recklessly failing to follow reasonable procedures to assure the maximum possible accuracy of the information included in its criminal background reports, and specifically in its preparation of Plaintiff's two reports. As to punitive damages based on this willful violation, Plaintiff met three of the five *Gore* factors used to gauge a defendant's level of reprehensibility.  We therefore conclude that Defendant's conduct was reprehensible enough to warrant the imposition of punitive damages.  Yet, while Defendant's conduct was sufficiently reprehensible to support an award of punitive damages, it was not, in the grand scheme of things, severely reprehensible.

To recap, Defendant's procedures were deemed unreasonable as to both reports because, contrary to its own formal policy concerning the preparation of a criminal background report for a person with a common name, its actual practice

permitted the use of only two, instead of three, identifiers.  In this case, the

Plaintiff and the person whose criminal record was wrongly attributed to Plaintiff

(1) had the same last name and the same or similar first name (Richard versus

Ricky) and (2) the same date of birth.  In its willingness to use only two identifiers

to attribute public information to the subject of an investigation bearing a common

name, Defendant should have known that there would be occasions when a subject

would be wrongly tagged with another person's criminal record, even if those

occasions might be relatively infrequent.  In other words, Defendant should have

envisioned that, every now and then, there could be two people living in the same

state, with the same name and the same date of birth.

In mitigation, Defendant argues that its overall error rate between 2010 and

2013 was quite low, which is true:  the rate nationally for all types of errors

identified through the dispute resolution process, not just the ones involved in this

case, was only 0.38%.  But as Plaintiff points out, given the large number of

reports issued, even this low rate ensnared over 13,000 people during this time

period.  Plaintiff, however, never showed how many of the erroneous reports

generated for these 13,000+ people arose from use of an inadequate common-name

procedure.  So, it is impossible for us, on this record, to assess the extent of the

notice to Defendant that its practices were resulting in the dissemination of

incorrect reports.

The second report issued in 2013 involved an additional and even less forgivable lapse by Defendant.  After issuing its first report in 2012, Defendant was alerted that it had incorrectly identified Plaintiff Richard A. Williams as being the "Ricky" Williams who had been charged with two counts of drug distribution in 2009.  One might reasonably assume that having been made aware of this error, Defendant would take measures to prevent any future attribution of Ricky Williams' public records to Plaintiff Richard A. Williams.  And indeed Defendant did have mechanisms in place to prevent any further attribution of the 2009 drug distribution charges to Plaintiff so that when the time came to issue a second report in 2013, these 2009 charges never appeared on this 2013 report.  But Defendant's automated system lacked the technical capability to ensure that other criminal charges against Ricky Williams—existing then or in the future—that had not appeared in the earlier report would be blocked from attribution to Plaintiff.  And that is what happened here:  once again, utilizing only two identifiers, Defendant deemed Ricky Williams to be the same person as Plaintiff and the former's 2004 convictions for assault and battery—which were not blocked because they had not been included in the 2012 background report—found their way into Plaintiff's 2013 background report.[20]

---

[20]  After the subject of a background report successfully disputes Defendant's inclusion on his report of another person's criminal charge, Defendant's blocking protocol will prevent that specific criminal charge from appearing on future reports prepared for the consumer.  But other

As for Defendant's awareness of the inadequacy of its blocking procedure, Plaintiff has failed to bore down into the numbers to disclose how many of the misattributions by Defendant of another person's criminal record involved a second mistake, such as happened here.  Given Plaintiff's absence of proof, we have no idea whether this kind of occurrence happened a lot or rarely.  And a high frequency of this type of occurrence is something that Plaintiff should have seized on and proved at trial if he wanted to justify an award of extraordinarily high punitive damages.[21]  Yet, Plaintiff failed to do so.  Notably, Plaintiff referenced as a basis for punitive damages both the common-name practice that led to the errors in both reports and the blocking failure that contributed to the error in the second report, but Plaintiff understandably relied on this second error as an aggravating factor that warranted the award of substantially more damages for this second report than for the first report.[22]  Plaintiff's failure to provide some context for the

---

charges against the same person wrongly identified as the subject may show up on the latter's future reports if, for example, (1) Defendant simply missed the other charges in preparing the earlier report, (2) the person sustains additional criminal charges after the earlier report was prepared, or (3) the prospective employer authorizing the second background investigation has requested that Defendant use broader time parameters when conducting its investigation.

[21]  Plaintiff's counsel asked the jury to award between 1 million and 3.3 million dollars in punitive damages.  The jury went high, with a 3.3 million dollar award.

[22]  In arguing for compensatory damages, Plaintiff's counsel suggested that the jury should award Plaintiff $100,000 in non-economic compensatory damages for the first erroneous match in the 2012 report and $275,00 for the second mismatch in the 2013 report.  In other words, Plaintiff deemed the errors leading to the second erroneous report as representing 73% of the damages Plaintiff was requesting.

frequency of this second type of error, however, weakens his case for the extremely high punitive damages he was awarded in this case.

Obviously, no cheers are due Defendant.  Defendant should have done a better job, and it must pay a price for its lapses.  But when one is attempting to monetize how much a defendant should be punished for its conduct, the extent to which the Defendant has acted with the knowledge that its conduct will harm the plaintiff—and thereby with the imputed intent to do so—is an important factor. Indeed, the cases with similar ratios on which our Court has affirmed the punitive damages award involved intentional conduct.  Plaintiff failed to show that Defendant's conduct, while reckless, was so reckless as to imply an intent to create this harm, or that the conduct demonstrated the same degree of intent found in those cases whose punitive damages we have affirmed.  And a defendant's intent plays an important role in gauging the extent of the reprehensibility.

In that vein, we contrast Defendant's conduct with that of the defendant in *McGinnis*, whose punitive damages award of $3 million was close in amount to the $3.3 million award in this case.  In *McGinnis*, the jury awarded the plaintiff $506,000 in compensatory damages and $3 million in punitive damages, which translates to a ratio of 5.9:1.  *See McGinnis*, 901 F.3d at 1290.  In affirming the award of punitive damages, we noted the "high degree of reprehensibility" in the defendant's conduct:  a degree of reprehensibility not present here.  As noted

above, the defendant in *McGinnis* tormented the plaintiff with unceasing, unexplained, and unwarranted increases in monthly mortgage payments, accompanied by a stubborn refusal to respond to the plaintiff's repeated frantic pleas and culminating in the defendant's efforts to foreclose on her property.  In finding a high degree of reprehensibility, the *McGinnis* panel noted that the plaintiff had demonstrated all five of the *Gore* factors used to gauge reprehensibility and that the jury had found that the defendant acted with a specific intent to harm the plaintiff.  *Id.* at 1292–93.  Nothing of that kind occurred in this case.  Here, while Defendant's protocols were markedly lackluster, Defendant quickly corrected both of its reports when Plaintiff informed Defendant of its error.

In short, considering all the above facts, a $3.3 million punitive damages award, on top of $250,000 in compensatory damages,[23] is a startling amount of money.  We cannot infer that Defendant would have been on notice that its practices, slack though they were, would result in this level of punishment for a single plaintiff's injuries.  That a $3 million punitive damages award, representing a 5.9:1 ratio between punitive and compensatory damages, met constitutional

---

[23]  Indeed, as Plaintiff had only claimed that his economic damages were approximately $78,000, Defendant argues that a goodly portion of the remaining $172,000 could also be considered as intended to punish the defendant.  *See State Farm*, 538 U.S. at 426 (holding that to the extent compensatory damages are based on the infliction of emotional distress, such "[c]ompensatory damages . . . already contain this punitive element," and citing the Restatement of Torts for the proposition that "[i]n many cases in which compensatory damages include an amount for emotional distress . . . there is no clear line of demarcation between punishment and compensation . . . .").

muster in *McGinnis* does not suggest that the $3.3 million punitive award—representing a 13:1 ratio—should likewise do so on the facts here. We conclude that application of a 4:1 ratio, which would reduce the punitive damages from $3.3 million to $1 million and yield a total award of $1,250,000, does pass constitutional muster. Such an award is sufficient to punish Defendant for its conduct and to deter future such misconduct.

While this reduction will surely disappoint Plaintiff, the extent of the reduction will also leave Defendant unhappy because Defendant contends that the ratio here should be no more than 1:1. Defendant relies on the Supreme Court's advice that when substantial compensatory damages have been awarded, a punitive award that exceeds that compensatory amount may sometimes be deemed unconstitutionally excessive. The notion underlying that principle is an awareness that a defendant may not much care how one characterizes the money it is required to pay; it cares about how much money it is out. Thus, if a plaintiff has already been awarded a substantial compensatory award, the defendant has already been punished—and, correspondingly, deterred—and a higher amount of punitive damages will be unnecessary to get the defendant's attention.

Defendant strongly relies on the  Seventh Circuit's recent decision in *Saccameno v. U.S. Bank National Association* in support of its position that the punitive damages award here should be in line with a 1:1 ratio. In *Saccameno*,

much like *McGinnis*, the plaintiff was plagued by a home mortgage servicer who repeatedly claimed that the plaintiff was in default when she was actually current with her payments, who was obstinate in its refusal to correct its records, and who even began unwarranted foreclosure proceedings. *Saccameno*, 943 F.3d at 1078–81. This bureaucratic nightmare lasted for months, with the plaintiff able to gain the defendant's attention only when she filed the lawsuit at issue. *Id.* at 1080. The jury awarded the plaintiff $582,000 in compensatory damages and $3 million in punitive damages, for a roughly 5:1 ratio. *Id.* at 1081.

On the facts of the case before it, the Seventh Circuit deemed the punitive damages award too steep to pass constitutional muster. *Id.* at 1086. The court noted the Supreme Court's admonition that a "substantial" compensatory award may merit a ratio closer to 1:1. *Id.* at 1090. And the court concluded that a $582,000 compensatory award, based largely on emotional distress, was indeed a "considerable" award for what was an "indifferent, not malicious, mistreatment of a single $135,000 mortgage." *Id.* With such a generous compensatory award, the Seventh Circuit concluded that a ratio no higher than 1:1 was necessary to meet constitutional muster. *Id.* Indeed, had the defendant's conduct been "truly egregious," the court might have considered a 5:1 ratio to be warranted. *See id.* In the case before it, however, the court considered a $582,000 compensatory award "for the indifferent, not malicious," misconduct to be "a considerable"

66

compensatory award.  *Id.*  And citing the Supreme Court's decision in *State Farm*,

the Seventh Circuit concluded that nearly all of the compensatory award in its case

"reflects emotional distress damages that already contain a punitive element."  *Id.*

(alteration accepted) (quotation marks omitted).

Given all the above, the Seventh Circuit determined that the ratio in the case

before it should not exceed 1:1, meaning the punitive damages award should not

have exceeded $582,000.  *Id.*  The court acknowledged that we had, in *McGinnis*,

"a factually similar case," permitted a $3 million punitive award.  *Id.* at 1088.  But

it distinguished *McGinnis*, noting that the jury in that case had found a specific

intent to harm and that the *McGinnis* court had concluded that all five *Gore* factors

were present, whereas in its case, only three factors were present.  *Id.*

Based on *Saccameno*, must we conclude here that only a 1:1 ratio, yielding

$250,000 in punitive damages, meets constitutional muster?  We think not.  First,

while the *Saccameno* decision is well reasoned, the Seventh Circuit does not

consider emotional distress to constitute proof of the first *Gore* factor; our Court

does.[24]  Second, the compensatory damages award deemed to be "significant" in

*Saccameno* was more than $500,000; the compensatory award here was $250,000.

---

[24]  In *McGinnis*, relying on earlier case authority, we found that the plaintiff had shown the existence of the first *Gore* reprehensibility factor, which looked to whether the harm caused was physical as opposed to economic, to be satisfied by the plaintiff's emotional distress.  The Seventh Circuit does not consider "mental deterioration," such as depression, anxiety, and panic disorders to constitute a physical injury for purposes of the first factor.  *Id.* at 1086.

Although $250,000 is certainly a great deal of money, it is below the level that

several out-of-circuit decisions have identified as a substantial award for purposes

of the 1:1 ratio inquiry, albeit "[w]hat counts as substantial depends on the facts of

the case." *Id.* at 1090 (collecting cases that have indicated a particular amount of

compensatory damages to be substantial and thereby warranting a 1:1 ratio).

Third, the Seventh Circuit focused largely on the harm the mortgage company

visited on this one debtor-plaintiff by its indifferent and careless treatment of the

plaintiff's account.  Here, although Plaintiff failed to develop the statistical

information enough to fully illuminate the extent to which Defendant's protocols

led to the erroneous attribution of criminal records to background report subjects,

Defendant itself was aware that its actual practices could lead, and had led, to

inaccurate results, as these practices were at odds with its own formal

acknowledgment that three identifiers should be used for subjects with common

names.  Further, it does not require a great deal of imagination for a consumer

reporting agency to predict that if it has once mismatched an individual with a

criminal record not his own, the same mistake could repeat itself in the future,

absent some effective mechanism used by the agency to prevent that reoccurrence.

A punitive damages award must be sufficient to not only punish Defendant,

but also to deter it from continuing to apply slipshod protocols in pursuing its

background investigations.  We cannot be confident that a punitive damages award

of only $250,000 would be strong enough medicine to fully gain Defendant's attention. Finally, we are mindful that it is only those punitive damages awards that are *grossly* excessive that are unconstitutional. That being so, we think it prudent to err on the side of endorsing an amount that might seem a bit excessive—and indeed might be more than what we would have imposed had we been jurors—so long as it is not a grossly excessive amount.

"Although there is no algorithm that yields a precise figure," *Kemp*, 393 F.3d at 1365, we conclude that, under the facts of the case, $1 million—which is four times the compensatory damages—reaches the upper limit of the due process guarantee. Any more than this "would prove an unconstitutional windfall." *Id.*

## CONCLUSION

The district court did not err in denying Defendant's motion for judgment as a matter of law, or, in the alternative, motion for a new trial or remittitur, to the extent Defendant challenged the sufficiency of the evidence regarding reputational harm and willfulness. We conclude, however, that the punitive damages award in this case violated due process and we remand the case with instructions that the district court reduce the award to $1 million.[25]

---

[25] In *Gore* and *State Farm*, the Supreme Court remanded the cases for "further proceedings not inconsistent with [the] opinion[s]." *State Farm*, 538 U.S. at 429; *Gore*, 517 U.S. at 586. Because the record is fully developed in this case, however, we conclude that it is appropriate to remand with instructions for the district court to remit the award to a specific amount, which we have determined is the highest amount that would comply with due process.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

MARTIN, Circuit Judge, concurring:

I read the Majority opinion to be within the bounds of Supreme Court precedent governing punitive damages.  I admire the Majority's thorough investigation into precedent governing punitive damages and its candor in recognizing that what it ultimately does is "eyeball the punitive damages award," weigh the misconduct that resulted in the punitive damages award against the harm caused, and then decide whether we, as judges, think the award is "grossly excessive."  Maj. Op. at 57.  If left to me, I would not say that the jury's award of $3.3 million to Mr. Williams is "grossly excessive."  Neither would I say, as a matter of law, that the 13-1 ratio of punitive damages to compensatory damages awarded to Mr. Williams "violates th[e] benchmarks" established by the Supreme Court for evaluating punitive damage awards.  Id. at 58.  After all, the Supreme Court has repeatedly declined to impose a bright-line ratio which a punitive damages award cannot exceed.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524 (2003); Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18, 111 S. Ct. 1032, 1043 (1991) ("[We] need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit in every case.").  But our court decides these cases by panels of three.  And just as it is true that I would not say a 13-1 ratio of punitive to compensatory damages "violates th[e] benchmarks" set by

the Supreme Court for determining whether a punitive damages award is unconstitutionally excessive, neither can I say that the result reached by the Majority violates those benchmarks.  For that reason, I concur in the result reached by the Majority.

O'SCANNLAIN, Circuit Judge, concurring:

While I concur in Judge Carnes's opinion remitting the punitive award to 1 million dollars, I write separately to explain why punitive damages even above $500,000 might well be "grossly excessive." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  From time to time, each member of a three-judge panel will form a conclusion that differs from the two others.  The only way to resolve such a disagreement is to meet in the middle—as we have done.

I

We limit punitive awards because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  When courts are faced with a constitutional challenge to the amount of punitive damages, the essential question is what constitutes the most severe penalty for which the defendant received fair notice.  Without a comparable civil penalty, a defendant can reasonably expect that punitive damages will approximate those awarded in similar cases.

II

I agree with Judge Carnes that the "3.3 million dollar award was unconstitutionally excessive."  Yet, the precedents collected by Judge Carnes

suggest that First Advantage would only have fair notice of exposure to punitive

damages of up to about $500,000, two times the $250,000 compensatory damages.

She cites fifteen challenges to a punitive award where the compensatory award was

between $200,000 and $300,000.  In seven of the nine cases in which the punitive

award was affirmed, the ratio of punitive-to-compensatory damages was 2:1 or

less.[1]

Furthermore, the six cases in which the circuit court vacated the punitive

damages award offer even stronger support for a $500,000 limit in this case.  In

four such cases, the punitive award was remitted to $500,000 or less.  *See*

*Mercado-Berrios v. Cancel-Alegría*, 611 F.3d 18, 30 (1st Cir. 2010) (remitting to

$500,000); *Clark v. Chrysler Corp.*, 436 F.3d 594, 612 (6th Cir. 2006)

($471,258.26); *Mathie v. Fries*, 121 F.3d 808, 817 (2d Cir. 1997) ($200,000);

*DiSorbo v. Hoy*, 343 F.3d 172, 189 (2d Cir. 2003) ($75,000).  The two such cases

with larger punitive damages dealt with conduct that was significantly more

reprehensible than that at issue here.  *See Cont'l Trend Res., Inc. v. OXY USA Inc.*,

101 F.3d 634, 638, 643 (10th Cir. 1996); *Watkins v. Lundell*, 169 F.3d 540, 546–47

(8th Cir. 1999).

---

[1] The other two cases are distinguishable.  In one case, an 8:1 ratio was affirmed because the conduct was "particularly egregious."  *Craig Outdoor Advert. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1020 (8th Cir. 2008).  In the other case, a 7:1 ratio was affirmed because the defendant failed to challenge the district court's reprehensibility findings.  *In re C.R. Bard, Inc.*, 810 F.3d 913, 931 (4th Cir. 2016).

Indeed, the range of levels down to which the circuit courts remitted the

punitive damages can be accounted for by the varying degrees of reprehensibility

of each defendant's conduct, a factor that is the "most important" consideration in

determining the limit on punitive damages.  *Gore*, 517 U.S. at 575; *see also Bogle*

*v. McClure*, 332 F.3d 1347, 1360 (11th Cir. 2003).  As Judge Carnes discusses, and

I agree, First Advantage's behavior was neither malicious nor indifferent to health

and safety, and there is insufficient evidence that the wrongful conduct at issue in

this case has been frequently repeated.  Instead, the degree of reprehensibility in

this case depends on two factors: Richard Williams's financial vulnerability and

the fact that he suffered physical symptoms of emotional distress, such as

diminished appetite or insomnia.  Judge Carnes compares this case to *Watkins*, in

which the court remitted the punitive award to $940,000 for a 4:1 ratio.[2]  *Watkins*,

169 F.3d at 547.  Yet, as Judge Carnes concedes, the district court found that the

*Watkins* defendant "engaged in a pattern, practice or scheme characterized by fraud

or deceit," several degrees more reprehensible than First Advantage's conduct.  *Id.*

---

[2] Judge Carnes regards such a 4:1 ratio as a "default" constitutional limit on punitive damages. The Supreme Court has not called a 4:1 ratio a default, but the Supreme Court has acknowledged the long English tradition of statutes that sanctioned conduct with double, treble, or—at most—quadruple damages.  *See Gore*, 517 U.S. at 581; *State Farm*, 538 U.S. at 425.  Such a tradition could give a potential defendant notice that punitive damages may rise as high as four times actual damages, at least insofar as the sanctioned conduct is analogous to conduct sanctioned by such quadruple-damages statutes.  Yet, traditional statutes are only one source among many for the severity of sanction First Advantage could have expected.  The recent practice of the federal courts faced with comparable conduct might well offer stronger evidence.

(quotation marks omitted).  At worst, First Advantage's conduct is comparable to

that at issue in *Clark*, in which the defendant's conduct caused the death of the

plaintiff even though it was neither malicious nor indifferent to health and safety.

*Clark*, 436 F.3d at 601–05.  I suggest that the roughly $500,000 in punitive

damages awarded in *Clark* is the most that First Advantage could reasonably

expect to have been punished.

Additional considerations counsel against permitting a punitive award above

$500,000.  First, if we set aside the question of the punitive-to-compensatory ratio

and simply examine the punitive award, this court has already held that punitive

damages greater than $250,000 "would prove an unconstitutional windfall,"

despite the fact that the defendant in that case was at once more reprehensible and

less likely to be deterred by a $250,000 punishment than is First Advantage.  *Kemp*

*v. AT&T*, 393 F.3d 1354, 1365 (11th Cir. 2004).  Second, only $78,272 of the

$250,000 compensatory award in this case could have been for economic damages;

the bulk of the compensatory award was noneconomic damages for emotional

distress or reputational harm.  The Supreme Court has instructed us that such

noneconomic damages "already contain [a] punitive element."  *State Farm,* 538

U.S. at 426.  Thus, even if punitive damages were remitted to $500,000, damages

containing a "punitive element" ($671,728) would still equal 8.6 times the

maximum economic damages ($78,272).  Such considerations, I suggest,

strengthen the conclusion that $500,000 in punitive damages might well constitute the "outermost limit of the due process guarantee." *Id.* at 425.

III

Notwithstanding such observations, I am pleased to concur in Judge Carnes's opinion.